[No. S004789. Crim. No. 26423. May 7, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH CLAIR, Defendant and Appellant.

## COUNSEL

John N. Hauser, under appointment by the Supreme Court, McCutchen, Doyle, Brown & Enersen, Leslie G. Landau, Jordan C. Budd, Rhonda L. Donato, Roberta M. Harding and Anne M. Deibert for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Robert M. Foster and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190 et seq.).

On August 15, 1985, the District Attorney of Orange County, on behalf of the People, filed an information in the superior court against defendant Kenneth Clair.

Count I charged that on or about November 15, 1984, defendant murdered Linda Faye Rodgers. (Pen. Code, § 187.)

Count II charged that on or about that same date, defendant committed burglary by entering a residence occupied by Kai and Margaret Henriksen at 1721 West Wilshire Avenue in Santa Ana with intent to commit a theft. (Pen. Code, § 459.)

Count III charged that on or about November 7, 1984, defendant committed burglary by entering the same residence with the same intent. (Pen. Code, § 459.)

Count IV charged that on or about January 14, 1985, defendant committed burglary (Pen. Code, § 459) by entering a residence occupied by Murline

Owens at 800 South Sullivan Street in Santa Ana with intent to commit assault with a deadly weapon (*id.*, § 245, subd. (a)) and/or rape (*id.*, § 261).

It was separately alleged that defendant murdered Rodgers under the special circumstances of felony-murder-burglary (Pen. Code, § 190.2, subd. (a)(17)(vii)), torture murder (*id.*, § 190.2, subd. (a)(18)), and felony-murder-rape (*id.*, § 190.2, subd. (a)(17)(iii)).

It was further alleged that on or about September 9, 1976, defendant had been convicted in the State of Louisiana of the serious felony of armed robbery in violation of that state's laws. (Pen. Code, §§ 667, subd. (a), 1192.7, subd. (c).)

Defendant pleaded not guilty to the charges and denied the allegations. He subsequently moved the court to set aside the information under Penal Code section 995. He argued, inter alia, that there was insufficient evidence as to the Owens burglary and the torture-murder special circumstance. On the People's concession, the court dismissed the former and struck the latter.

On June 22, 1987, the district attorney filed the first amended information, on which this case was tried. Count I charged the Rodgers murder; count II, the Henriksen burglary on November 15, 1984; and count III, the Henriksen burglary on November 7, 1984. The special circumstances of felony-murder-burglary and felony-murder-rape were alleged; also alleged was the prior serious-felony conviction in Louisiana.

Defendant again pleaded not guilty to the charges and denied the allegations.

Trial was by jury. The panel returned verdicts finding defendant guilty as charged of the single count of murder and both counts of burglary, determining each offense to be in the first degree; it also rendered a finding of true on the felony-murder-burglary special-circumstance allegation, and a finding of not true on the felony-murder-rape special-circumstance allegation. It subsequently returned a verdict of death. Defendant having earlier waived a jury trial on the prior serious-felony conviction allegation in favor of a bench trial, the court impliedly rendered a finding of true. It proceeded to enter judgment as follows: the sentence of death was imposed for the murder; sentence as to the Henriksen burglary on November 15, 1984, was stayed under Penal Code section 654; the midterm of four years in prison was imposed for the Henriksen burglary on November 7, 1984, and then stayed until execution of the penalty for the murder; and an additional term of five years in prison was imposed for the prior serious-felony conviction in Louisiana, and then stayed until execution of the penalty for the murder.

As we shall explain, we conclude that the judgment must be affirmed.

## I. FACTS

### A. *Guilt Phase*

The People introduced evidence that established the following facts.

On or about November 7, 1984, a house at 1721 West Wilshire Avenue in Santa Ana was burglarized and a number of items were stolen. Kai and Margaret Henriksen resided there with Margaret's four young children. Linda Faye Rodgers served as the Henriksens' babysitter. She lived there as well with her own young daughter.

On the night of November 15, while the Henriksens were out, the house was again burglarized. Rodgers was murdered, having been beaten, stabbed, and strangled. Her body was found supine on the bed in the master bedroom, with her hands bound behind her back, naked from the waist down, and with her legs open and a vibrator between her thighs. A number of items were stolen.

It was undisputed that defendant committed the November 7 burglary. At that time, he was squatting in a vacant house next door to the Henriksens at 1725 West Wilshire Avenue. On November 11 he was arrested there and put in jail. In the early evening of November 15 he was released.

What *was* disputed was whether defendant committed the November 15 burglary and murder.

To prove that defendant was the perpetrator, the People called several witnesses and offered numerous exhibits.

Among their witnesses were Kai and Margaret Henriksen and, most prominently, Pauline Cody, née Flores, who was defendant's lover at the time of the crimes.

Flores testified to the following matters, among others. On the night of November 15, she happened on defendant in the general vicinity of West Wilshire Avenue. Later on, he asked her to walk with him as he went to recover some "personal property," and she did so. They got to the area of the Henriksen residence and the vacant house. She knew he had squatted in the latter. Once there, he asked her to wait by a tree. He said he would be right back. He was not. After about an hour, she began to retrace the path she had taken.

Five or ten minutes later, Flores encountered defendant. He was carrying two speakers, a light blue floral blanket, and a six-pack of Budweiser beer. She asked where he had been. He said he had gone to a liquor store on a certain corner to get some beer. He did not generally drink Budweiser beer. Moreover, there was in fact no liquor store on the corner in question. Flores then asked what took him so long. He said he had "just finished beating up a woman." She did not inquire further "[b]ecause I would have got the shit beat out of me." She saw blood on the palm of his right hand. She asked where it had come from. He said he had been "fighting with somebody." Here too she did not inquire further. They walked to a church, sat on the steps, and talked for a while. They then went behind some trees on the property. He showed her some goods, including pieces of jewelry. They had sexual intercourse and went to sleep. Margaret Henriksen later testified that items including the speakers, blanket, beer, and jewelry had been stolen that night.

Among the People's exhibits were an audiotape recording and a transcript of a conversation between defendant and Flores on January 16, 1985. Unknown to him, she was by that time working as an undercover police agent. Fitted with a concealed audiotape-recording device, she met him as he was released from jail after his arrest for an unspecified offense (which was in actuality the Owens burglary). In the course of the conversation, he made a number of statements bearing on the November 15 burglary and murder. Although at one point denying involvement, several times he made what were apparently admissions—some express in his own words, others implied through his silence or equivocal response in the face of her accusations.

Defendant challenged the sufficiency of the People's evidence linking him to the November 15 burglary and murder. For example, he attacked the credibility of the witnesses and the believability of their testimony—especially with regard to Flores, whose character and statements were easily assailed. He also attempted to show that he made no admission, express or implied, during the January 16 conversation. In addition, he pointed to the absence of physical evidence placing him in the Henriksen residence. In his case, he called a single witness and presented a few exhibits. He himself did not take the stand.

### B. *Penalty Phase*

The People presented a case in aggravation that focused on the circumstances of the murder itself and included as well two instances of other criminal activity involving force or violence and one prior felony conviction.

As to the murder, a stipulation was presented in lieu of testimony that "at the time of her death [the victim] had a mild hemiparesis of the brain as a

result of congenital cerebral palsy which entailed a varying but never totally disabling of her impairment [*sic*] in motor coordination and muscular development on her left side only."

One of the instances of other criminal activity involving force or violence concerned the armed robbery of Colleen Daspit and Dorothy Carboni. Daspit testified to the following matters, among others. On August 15, 1976, the two women were walking alone in the Rose Garden in City Park in New Orleans. Defendant came up. He grabbed Daspit's left arm and pointed a handgun between her eyes; he told her to move back toward some hedges, she refused, he let her go, and she began to run. He then grabbed Carboni. Daspit stopped, not wanting to abandon her companion. He then ordered, "Your purse." Carboni complied quickly. Daspit did not, frozen in her place. Carboni said, "Colleen, give him your purse." Daspit then did so. Thereupon, he fled. Some time later, he was apprehended.

The single prior felony conviction comprised the adjudication in Louisiana that defendant was guilty of the armed robbery of Colleen Daspit.

The second instance of other criminal activity involving force or violence concerned the alleged burglary with intent to commit assault with a deadly weapon and/or rape against Murline Owens.

Murline Owens and her brother Milton Owens testified that on January 14, 1985, Murline lived in the Voltaire Apartments in Santa Ana with Milton, who was evidently younger; the apartment had one bedroom and one bathroom, which were adjacent; that morning, they left for work.

After 8 a.m.—according to the testimony he gave—Santa Ana Police Officer Dale Patrick Courville was dispatched to the Owens apartment, together with other officers, to investigate a reported burglary. Two persons were standing in front of the apartment, one with a tire iron. Courville checked front and rear doors; both were locked. He examined the rear kitchen window; it revealed signs of entry. He knocked on each door, announced he was a police officer, and received no response. Soon, he had the apartment building manager open the front door, announced he was a police officer, and entered, evidently with other officers.

Defendant—Officer Courville continued—was under the covers in the bed in the bedroom. He was the only person found in the apartment. Courville approached him with gun drawn and ordered him not to move. He noticed he was wearing a gray sweat suit without shoes or socks. He asked who he was, defendant said, "Kenneth Marlson"; he asked whether he had identification,

defendant said no; he asked if he lived there, defendant said no; he apparently asked what he was doing there, defendant said he had spent the previous night with a woman who lived in the apartment; he asked if he knew the woman, defendant said yes, naming Murline Owens, stating she was his girlfriend, and adding she had gone to work. Courville soon learned that defendant was not known to Owens. He then placed him under arrest for suspicion of residential burglary, informing him that he was doing so. Before leaving the apartment, defendant retrieved some articles he had earlier put in a closet, including a jacket, pants, and shoes.

After they arrived at the Santa Ana Police Department—Courville concluded—Courville advised defendant of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and defendant effected a waiver. Interrogation then ensued. Courville questioned defendant on how he entered the apartment. At first, defendant responded that he went in through the rear door, which he claimed was unlocked. Courville accused him of lying. Thereupon, defendant admitted that he removed the kitchen window, slipped in, and then put it back in its place. Next, Courville questioned defendant on why he entered. Defendant responded that he went in to sleep. Finally, Courville questioned defendant on whether he touched anything. Defendant responded that he handled only the kitchen window.

On their return, as they testified, Murline and Milton Owens discovered that the apartment was not as they left it that morning: a counter under the kitchen window "was leaning down," as though "somebody [had] stepped on it"; the kitchen drawers were open; a television set and a videocassette recorder had been moved from their place by a wall, and a screwdriver of unknown provenance was lying nearby; someone had defecated in the toilet bowl and had not flushed the water; and a butcher knife with a large blade was resting on the bathroom floor.

Defendant presented a case in mitigation that focused on any lingering doubt the jurors may have had about his responsibility for the murder and also on his background and character.

Defendant's mother, Celina Clair Gladden, testified concerning the following matters, among others, bearing on his history. In 1959 she bore defendant out of wedlock in New Orleans; his father was John Anderson, who abandoned him before birth; she subsequently bore three other sons. At the time defendant was born, she lived in a family home with her mother, her sister, and one of her brothers, Jack Clair; she continued to live there for most of the coming years down to the present. To earn a living, she did

domestic work; from 1965 onward, she derived most of her income from a restaurant and bar she owned and operated with her family. Throughout his childhood and youth, defendant was disciplined by Jack, who used progressively sterner and harsher physical measures. He did not like Jack. In his early years, he did well in school and was interested in sports.

In 1972 or 1973, Gladden married. Her husband had served a term in the Louisiana State Prison at Angola. Defendant did not like the man, felt he had invaded the privacy of his home, and resented his attempts to discipline him by talking about his experience of prison life. He became withdrawn, and lost interest in school. Gladden sought and obtained psychological counseling for him, and continued it for some months.

One day in what was apparently the early part of August 1976, Jack attempted to get defendant to leave a bar, he refused, Jack tried to hit him with a car, but instead hit Gladden—who was then eight months pregnant and required hospitalization for her injuries. Defendant became very angry with Jack and very upset. A few days later, he committed the Daspit armed robbery. He had never previously been in trouble. On his conviction, he was sent to Angola.

In 1982 defendant was released. He returned to Gladden's home. He was very nervous. He sometimes worked in the family restaurant and bar, and sometimes did gardening jobs. Soon, he left for California, at the request of his paternal grandmother who lived here.

Gladden also testified that she did not believe that defendant committed the murder. "He's not that type of boy. He's very compassionate. He always like [sic] to help people . . . ." She gave the following as an example: a few years before, there was a terrible flood; a passerby told her some people were trapped in a house; ". . . I got Kenneth and his brothers to go get those people and he brought them back to my house . . . ."

Lastly, Gladden stated, "I love Kenneth," and pleaded for his life.

John Anderson, defendant's father, testified as well. The substance of his statements was this: he lived in Oakland; his mother became ill, wanted to see defendant once before she died, and asked him to come to California; Anderson first met defendant in Richmond in 1983; he brought him into his home; a problem arose because Anderson's wife believed that defendant's presence might cause Anderson to get in touch with Gladden; he soon arranged for defendant to move out and stay with a niece; and he provided for defendant's support at his home and at his niece's, but had never done so earlier.

Dwana Paul gave testimony concerning, inter alia, the history of the relationship she and her children had with defendant: she met him in Richmond in November 1983; they soon became lovers; in December of that year, she welcomed him into the home she shared with her children; she employed him as a handyman at two apartment complexes she owned; in April 1984, they separated because of emotional difficulties she was then experiencing; they continued to maintain contact with each other; and as of the time of trial, she evidently intended to marry him. She also gave testimony on the substance of the relationship she and her children had with defendant—which was, in a word, positive. In its course, she stated that defendant was "compassionate, warm and considerate of other people." She added, "I love him dearly," and pleaded for his life.

Leona Patterson testified on points including the following. She is defendant's aunt. In May 1984 she was living with her husband and three children in the Voltaire Apartments in Santa Ana. Defendant had recently arrived from Northern California. She welcomed him into her home. He soon began to do temporary work. Shortly thereafter, as a result of a misunderstanding, her husband "blew up" at defendant, threw his suitcase out of a window, and told him to leave. Her husband threatened violence; defendant refused to respond in kind. She concluded with an express statement of love for defendant and an implicit plea for his life.

Elizabeth Ann Ballard testified in substance that she met defendant in 1986 at the Orange County jail; since then, he had studied the Bible with her on a regular basis; he had also enrolled in scripture courses, taken tests, and obtained certificates; and, in addition, he undertook to conduct Bible study with other inmates.

Defendant himself did not take the stand.

## II. GUILT ISSUES

Defendant raises a number of claims attacking the judgment as to guilt. As will appear, none is meritorious.

### A. WHEELER/BATSON *Violation*

In *People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748], we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership or bias violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16,

of the California Constitution. Subsequently, in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 84-89 [90 L.Ed.2d 69, 106 S.Ct. 1712], and its progeny, the United States Supreme Court held that such a practice violates the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

Blacks, of course, are a cognizable group for purposes of both *Wheeler* (22 Cal.3d at p. 280, fn. 26) and *Batson* (476 U.S. at pp. 84-89 [90 L.Ed.2d at pp. 79-83]). In addition, Black women are a cognizable subgroup for *Wheeler.* (*People* v. *Motton* (1985) 39 Cal.3d 596, 605-606 [217 Cal.Rptr. 416, 704 P.2d 176].)

■ Under *Wheeler,* there is a presumption that a prosecutor uses his peremptory challenges in a constitutional manner. (22 Cal.3d at p. 278.) The defendant bears the burden to show, prima facie, the presence of invidious discrimination. (*Id.* at p. 280.) If he succeeds, the burden shifts to the prosecutor to show its absence. (*Id.* at p. 281.) If he fails, the defendant's prima facie showing becomes conclusive. (See *id.* at p. 282.) In such a situation, the presumption of constitutionality is rebutted. (*Ibid.*) Substantially the same principles apply under *Batson.* (See 476 U.S. at pp. 89-98 [90 L.Ed.2d at pp. 82-89].)

In this case, the jury-selection process was as follows. The prospective jurors were examined as to hardship, with some excusals. Those who remained were examined as to the death penalty, with some further excusals. Those who then remained were randomly drawn into the jury box for further examination leading to the taking of peremptory challenges and additional challenges for cause. It appears that among this group were four Blacks: Horace Reese, Doris Humphrey, Rosalind Smith, and Joseph Jackson. Citing *Wheeler,* defense counsel requested the court to require the prosecutor to justify any strike he might make against any of the four.[1] The court declined. It observed that justification was then premature, and could properly be raised if and when a strike was made. Subsequently, the prosecutor struck Humphrey. Counsel did nothing. The court then excused Reese for cause on the parties' stipulation. The prosecutor later struck Smith. Again, counsel did nothing. Jackson was sworn as a juror and served on the panel.

■ Defendant contends that the prosecutor peremptorily challenged prospective jurors Humphrey and Smith on the basis of group membership or bias in violation of the United States and California Constitutions. We cannot agree. The presumption of constitutionality stands unrebutted. Counsel did not even attempt to make the necessary prima facie showing of

---

[1]We note in passing that defendant is Black and the victim was Caucasian.

invidious discrimination. The reason for his omission seems plain: no invidious discrimination appears. Indeed, the record supports an inference that each strike was predicated on views expressed by the prospective juror in opposition to the death penalty, at least in this case.

Defendant's argument against our conclusion fails. Particularly unpersuasive is an assertion that the trial court erred in denying counsel's request for justification. The request was manifestly premature. Also unpersuasive is an assertion that the court labored under an erroneous belief that one invidiously discriminatory peremptory challenge was allowed. It appears that the court simply entertained the altogether sound view that any request to justify a strike was premature before a strike was made. We recognize that following the prosecutor's example, the court used the phrase "systematic exclusion" as a shorthand to refer to a *Wheeler* violation. The term, of course, is "not apposite" for this purpose—although it has been so employed by this court and others. (*People v. Fuentes* (1991) 54 Cal.3d 707, 716, fn. 4 [286 Cal.Rptr. 792, 818 P.2d 75].) ■■ ■■ On this record, however, the court's usage is without significance.[2]

**B.** *Granting of the People's Motion to Bar Impeachment of Kai Henriksen With a Prior Felony Conviction*

Article I, section 28, subdivision (f), of the California Constitution—which was adopted on June 8, 1982, when the voters approved an initiative

---

[2]Defendant claims in substance that trial counsel provided him with ineffective assistance under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution by failing to attempt to make a prima facie showing of invidious discrimination. To succeed, he must show (1) deficient performance under an objective standard of professional reasonableness and (2) prejudice under a test of reasonable probability. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839] [discussing both federal and state constitutional rights].) He fails. Counsel's performance was not deficient because his omission was not unreasonable. As stated, no invidious discrimination appears.

Defendant also claims that the asserted *Wheeler/Batson* violation entails the infringement of his rights under the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. There was no *Wheeler/Batson* violation.

On a related matter, defendant claims in a footnote that the trial court erred under the impartial-jury guaranty of the Sixth Amendment when it excused six prospective jurors because of their unfavorable views on the death penalty: Julia Gonzales, Beatrice Munoz, Diana Lepper, Linda Wright, Juan Gattas, and Laura Yorba. The point is not properly raised: defendant makes his assertion in a perfunctory fashion without any supporting argument. (*People v. Marshall* (1990) 50 Cal.3d 907, 945, fn. 9 [269 Cal.Rptr. 269, 790 P.2d 676].) In any event, it lacks merit. The crucial question is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 852-853, 105 S.Ct. 844].) Clearly albeit impliedly, the court gave an affirmative answer. The standard of review is substantial evidence. (*People v. Ashmus* (1991) 54 Cal.3d 932, 962 [2 Cal.Rptr.2d 112, 820 P.2d 214].) The test is met. Each of the six made plain that he or she could not choose death.

measure designated on the ballot as Proposition 8—declares in pertinent part that "Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding."

In *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], we held that "prior felony convictions" within the meaning of article I, section 28, subdivision (f) are such as necessarily involve moral turpitude, i.e., a readiness to do evil. (38 Cal.3d at pp. 306, 313-317 (plur. opn.); *id.* at p. 322 (conc. & dis. opn. of Grodin, J.).)

In *Castro*, we also held that trial courts retain their discretion under Evidence Code section 352 to bar impeachment with such convictions when their probative value is substantially outweighed by their prejudicial effect. (38 Cal.3d at pp. 306-313 (plur. opn.); *id.* at p. 323 (conc. & dis. opn. of Bird, C. J.).) We made plain that in exercising their discretion, trial courts should continue to be guided—but not bound—by the factors set forth in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], and its progeny. (38 Cal.3d at pp. 306-313 (plur. opn.); *id.* at p. 320 (conc. & dis. opn. of Grodin, J.); *id.* at p. 323 (conc. & dis. opn. of Bird, C. J.).) When the witness subject to impeachment is not the defendant, those factors prominently include whether the conviction (1) reflects on honesty and (2) is near in time. (*People* v. *Woodard* (1979) 23 Cal.3d 329, 335-337 [152 Cal.Rptr. 536, 590 P.2d 391].)

In *People* v. *Collins* (1986) 42 Cal.3d 378 [228 Cal.Rptr. 899, 722 P.2d 173], we followed *Castro* as to the points stated above. (42 Cal.3d at pp. 381, 391-392.)

Prior to opening statements, the People moved the trial court *in limine* for an order prohibiting defendant from impeaching Kai Henriksen with a felony conviction he had suffered in 1965 for voluntary manslaughter. Relying on *Castro*, *Collins*, and *Beagle*, the prosecutor claimed that the probative value of such impeachment would be substantially outweighed by its prejudicial effect. In evident recognition of the holding of *People* v. *Coad* (1986) 181 Cal.App.3d 1094, 1104-1111 [226 Cal.Rptr. 386], he conceded that a conviction for voluntary manslaughter necessarily involves moral turpitude for purposes of article I, section 28, subdivision (f). But he argued that Henriksen's conviction did not strongly reflect on honesty and, especially, that it was remote in time and was not followed by any others. He commented: "This is an important case to both sides. I believe Mr. Henriksen is an important witness. The question is: Should his credibility be damaged in front of a jury . . . with a 22-year-old prior conviction which does not involve honesty or veracity . . . ?"

Defendant opposed the motion. Counsel disputed the prosecutor's position on probativeness and prejudice.

The trial court granted the motion. "I find that that prior is marginally relevant but highly prejudicial. I'm going to exclude it under 352 primarily because of the remoteness of time."

Kai Henriksen subsequently gave testimony that related to the November 7 burglary and the November 15 burglary and murder, but did not directly implicate defendant as the perpetrator. The People's direct examination was brief. Defendant's cross-examination was slightly more extensive, and unimpeded.

■ Defendant contends that the trial court erred by granting the motion. ■ A ruling of this sort is reviewed for abuse of discretion. (*People* v. *Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 716]; see generally *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1239 [270 Cal.Rptr. 451, 792 P.2d 251] [holding that decisions involving a determination of probativeness and prejudice are examined under this standard].) ■ No abuse appears. It was altogether reasonable for the court to conclude that the conviction was "highly prejudicial" and only "marginally relevant" "because of the remoteness of time." Surely, another court might have concluded otherwise. That fact, however, reveals nothing more than that a reasonable difference of opinion was possible. Certainly, it does not establish that the court here "exceed[ed] the bounds of reason . . . ." (*People* v. *Stewart, supra,* at p. 65.)

Defendant argues against the trial court's ruling, but without persuasive force. We recognize that article I, section 28, subdivision (f) militates in favor of allowing a party to use any prior felony conviction to impeach any witness in any criminal proceeding. We also recognize that the prosecutor characterized Henriksen as an "important witness." The court was aware of these matters as well. Nevertheless, it proceeded to grant the People's motion. We cannot say that its decision was unreasonable. Defendant asserts that he should have been permitted to use the conviction to attack Henriksen's credibility both generally—i.e., by challenging his character—and specifically—i.e., by attempting to show he had a motive to lie to avoid suspicion for the murder. We cannot agree. Defendant never sought permission for a specific attack. He may not now raise any complaints in this

regard. By contrast, he did seek permission for a general attack. The court's refusal, however, was reasonable.[3]

## C. *Denial of Motion to Suppress the January 16 Conversation*

Prior to opening statements, defendant moved the trial court to suppress evidence of the January 16 conversation in its entirety on, among other grounds, the ground that his statements had been obtained by the police—through their undercover agent Pauline Flores—in violation of his right to the assistance of counsel under the Sixth Amendment to the United States Constitution. His argument was based on a claim that by January 16, his Sixth Amendment right to counsel had attached as to the November 15 burglary and murder—the main subject of the conversation. That claim rested in turn on the following premises: by January 16, he had become the focus of the investigation into those offenses; and by that same date, a Sixth Amendment right had attached as to certain other offenses, including (apparently) the November 7 burglary and the Owens burglary.

The People presented opposition. They conceded that Flores was an undercover police agent. Otherwise, they generally disputed the claim.

The trial court denied the motion. It determined, in substance, that defendant's Sixth Amendment right to counsel as to the November 15 burglary and murder had not in fact attached by January 16.

As noted, evidence of the January 16 conversation was subsequently admitted at trial.

---

[3]Defendant claims that the trial court's ruling was erroneous under the United States Constitution, specifically, the confrontation clause of the Sixth Amendment and, as a result, the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. Not so. The confrontation clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware* v. *Fensterer* (1985) 474 U.S. 15, 20 [88 L.Ed.2d 15, 19, 106 S.Ct. 292], italics in original (*per curiam*); accord, *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 683, 106 S.Ct. 1431].) Defendant was given—and indeed exploited—such an opportunity. The confrontation clause allows "trial judges . . . wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware* v. *Van Arsdall, supra*, at p. 679 [88 L.Ed.2d at p. 683] [speaking specifically of cross-examination on bias, but without limitation thereto].) The court here did no more than it was permitted.

Defendant may be understood to claim that the trial court's ruling was erroneous under the confrontation clause of section 15 of article I of the California Constitution. We do not discern—and certainly, defendant does not show—any merit in the point.

The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

■ In *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and its progeny, the United States Supreme Court held that "the government"—whether federal or state—"may not use an undercover agent to circumvent the Sixth Amendment right to counsel once" that right has attached. (*Illinois* v. *Perkins* (1990) 496 U.S. 292, 299 [110 L.Ed.2d 243, 253, 110 S.Ct. 2394, 2398-2399].) After attachment, "the Sixth Amendment prevents the government from interfering with the accused's right to counsel." (*Id.* at p. 299 [110 L.Ed.2d at p. 253, 110 S.Ct. at p. 2399].) Before attachment, by contrast, the constitutional provision is not implicated. (*Id.* at pp. 299-300 [110 L.Ed.2d at p. 253, 110 S.Ct. at p. 2399].)

■ The Sixth Amendment right to counsel "does not attach until a prosecution is commenced, that is, ' "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." ' " (*McNeil* v. *Wisconsin* (1991) __U.S. __, __ [115 L.Ed.2d 158, 166-167, 111 S.Ct. 2204, 2207], quoting *United States* v. *Gouveia* (1984) 467 U.S. 180, 188 [81 L.Ed.2d 146, 154, 104 S.Ct. 2292], quoting in turn *Kirby* v. *Illinois* (1972) 406 U.S. 682, 689 [32 L.Ed.2d 411, 417, 92 S.Ct. 1877] (plur. opn.); see, e.g., *People* v. *Mattson* (1990) 50 Cal.3d 826, 867 [268 Cal.Rptr. 802, 789 P.2d 983].) It is not enough, for example, that the defendant has become the focus of the underlying criminal investigation. (1 LaFave & Israel, Criminal Procedure (1984) § 6.4(e), p. 466; see, e.g., *People* v. *Hovey* (1988) 44 Cal.3d 543, 561 [244 Cal.Rptr. 121, 749 P.2d 776].)

The Sixth Amendment right to counsel, the United States Supreme Court has recently declared, is "offense specific." (*McNeil* v. *Wisconsin, supra,* __ U.S. at p. __ [115 L.Ed.2d at p. 166, 111 S.Ct. at p. 2207].) That is to say, it attaches to offenses as to which adversary judicial criminal proceedings have been initiated—and to such offenses alone. (*Id.* at p. __ [115 L.Ed.2d at pp. 166-167, 111 S.Ct. at p. 2207].)

■ As stated, defendant claims that the trial court erred by denying his motion. We do not agree.

Plainly, the trial court's determination that defendant's Sixth Amendment right to counsel had not attached as to the November 15 burglary and murder by January 16 was crucial.

Such a determination is reviewed thus: the conclusion itself is examined independently, the underlying findings are scrutinized for substantial evidence. (E.g., *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr.

867, 629 P.2d 961] [dealing with a determination that a defendant's Fourth Amendment rights had been violated].)

So reviewed, the trial court's determination is sound. The record supports —and, indeed, compels—only one conclusion. By January 16, the prosecution of defendant for the November 15 burglary and murder had *not* been commenced. By that date, adversary judicial criminal proceedings against him on those offenses had *not* been initiated.

In arguing his claim, defendant asserts that by January 16 he had become the focus of the investigation into the November 15 burglary and murder. Focus, however, is insufficient.

Defendant also asserts that by January 16 his Sixth Amendment right to counsel had attached as to certain other offenses, including the November 7 burglary and the Owens burglary. As to the November 7 burglary, no attachment occurred. As to the Owens burglary, any attachment was insufficient.[4] It is true that the "precise boundaries" of the " 'offense-specific' limitation" have yet to be "flesh[ed] out." (*McNeil* v. *Wisconsin, supra,* __ U.S. at p. __ [115 L.Ed.2d at p. 174, 111 S.Ct. at p. 2214] (dis. opn. of Stevens, J.).) But the November 15 burglary and murder simply cannot be deemed to embrace the completely unrelated Owens burglary within a single "offense." In arguing to the contrary, defendant relies, in part, on *Brewer* v. *Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232], *People* v. *Boyd* (1978) 86 Cal.App.3d 54 [150 Cal.Rptr. 34], *In re Michael B.* (1981) 125 Cal.App.3d 790 [178 Cal.Rptr. 291], and *People* v. *Sharp* (1983) 150 Cal.App.3d 13 [197 Cal.Rptr. 436]—but to no avail. Those cases are significantly helpful to his position only to the extent that they support the proposition that the Sixth Amendment right is not "offense-specific." ▮▮▮▮▮ To that extent, however, they are no longer vital.[5]

---

[4]We recognize that the January 16 conversation contained references—albeit few and insignificant—to offenses other than the November 15 burglary and murder. On a proper motion to suppress those references under the Sixth Amendment, defendant might have been entitled to relief. But he simply did not make a motion of that sort. We do not believe—and defendant does not even attempt to show—that the trial court was required to suppress such references sua sponte.

[5]Defendant claims that the trial court's ruling was error under the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment because it was error under the counsel clause of the Sixth Amendment. The point fails. As explained, the ruling was not erroneous under the latter provision. Hence, it was not erroneous under either of the former.

Defendant claims that the trial court's ruling was error under California law as well. He argues that the January 16 conversation should have been suppressed as the product of unlawful detention in violation of state law, including Penal Code section 849. In support, he

## D. *Denial of Motion to Exclude Photographs*

Prior to opening statements, defendant moved the trial court *in limine* to exclude certain crime scene and autopsy photographs, claiming that the items were irrelevant under Evidence Code section 210 and/or unduly prejudicial under Evidence Code section 352. The court conducted a hearing and reviewed the photographs. The result was to the following effect. It found some irrelevant and/or unduly prejudicial. It granted the motion as to these and subsequently ordered them excluded. It found others relevant and not unduly prejudicial. It denied the motion as to these and later received them in evidence as exhibits.

After the People completed their case-in-chief and just before they formally rested, the trial court sent the jury into the jury room alone to examine the exhibits that had been received in evidence. These exhibits—which comprised all that would be received at the guilt phase—numbered in the dozens, many for the People and a few for defendant. The court told the jurors: "Most of this evidence consists of photographs that you must look at even though it is distasteful to you." It continued: ". . . I must admonish you this is not the conclusion of the case. You shall not form any opinions nor conclusions with regard to this case by looking at the photographs. This is not the time to do it. The only time you can form opinions or conclusions is after the whole case is submitted to you including the instructions and the argument. Furthermore you shall not discuss any of the evidence when

asserts that he was unlawfully detained for both the November 7 burglary and the Owens burglary: as to the former, he was arrested without warrant on November 11, jailed, and released without arraignment on November 15; as to the latter, he was arrested without warrant on January 14, jailed, and released without arraignment on January 16. We reject the point. "It is, of course, 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' " (*People* v. *Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330], quoting *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) At trial, defendant failed to make any objection whatever based on unlawful detention in violation of state law. In any event, evidence can be deemed the product of unlawful detention if and only if the latter is something more than the "but for" cause of the former. (See *People* v. *Carrera* (1989) 49 Cal.3d 291, 323-324 [261 Cal.Rptr. 348, 777 P.2d 121].) Such is not the case here.

Finally, defendant claims in substance that the trial court's ruling was error under the United States Constitution because it was error under California law. We disagree. The major premise of defendant's argument—which is based on an unreasonable reading of *Hicks* v. *Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227]—is to the effect that error under state law is ipso facto error under the due process clause of the Fourteenth Amendment. But "[a] state-law violation is *not* automatically a violation of federal constitutional due process . . . ." (*People* v. *Ashmus, supra*, 54 Cal.3d at p. 984, fn. 14, italics in original; see *Estelle* v. *McGuire* (1991) ___ U.S. ___, ___-___ [116 L.Ed.2d 385, 398-399, 112 S.Ct. 475, 481-482].) The minor premise is that the ruling was erroneous under California law. But as explained, it was not.

you're in that jury room. You might say here, take a look at this if the person to your right is turning to look at it but do not discuss any of the items of the evidence at all." (Paragraphing omitted.) The jurors spent less than an hour in their examination. When they returned to open court, the People formally rested. Defendant then put on his case, calling a single witness, and rested.

 Defendant now contends that the trial court's ruling was erroneous to the extent that it allowed the introduction of the crime scene and autopsy photographs in question.

"The appropriate standard of review is abuse of discretion. The ruling comprises determinations as to relevance and undue prejudice. The former is reviewed under that standard. So is the latter." (*People* v. *Benson, supra,* 52 Cal.3d at p. 786, citation omitted.)

Having reviewed the challenged photographs ourselves, we discern no error.

The trial court did not abuse its discretion on relevance. Each of the photographs in question had some tendency in reason to prove at least one of the elements of at least one of the charged offenses—including, most prominently, malice aforethought, which belongs to first degree, willful, deliberate, and premeditated murder (see Pen. Code, §§ 187, subd. (a), 189). Indeed, intent to kill was clearly revealed by the visual fact that the perpetrator had bound the victim's hands behind her back and then beat her brutally. Defendant argues to the contrary, but unpersuasively.

Neither did the trial court abuse its discretion on undue prejudice. As noted, each of the photographs in question was relevant: intent to kill was clearly revealed. True, all were unpleasant, being full size and in color. Nevertheless, the court could reasonably have concluded that each item's prejudicial effect did not substantially outweigh its probative value. Again, defendant argues to the contrary. The first attack is "procedural." It fails. "Of course, 'on a motion invoking [Evidence Code section 352] the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value . . . .' " (*People* v. *Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84], quoting *People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) The record here does so. "[N]o more is required. Certainly, the trial judge need not expressly weigh prejudice against probative value—or even expressly state that he has done so." (*People* v. *Mickey, supra,* at p. 656, citation omitted.) Contrary to

defendant's implication, the present record is more than adequate for meaningful appellate review. The second attack is "substantive." For the reasons stated, it fails as well.[6]

In a related point, defendant contends that the trial court erred by ordering the jurors to examine the exhibits midtrial and by directing them to "look at" the "photographs . . . even though it is distasteful to you." Manifestly, a court has "inherent authority regarding the performance of its functions . . . ." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1260.) This authority, we believe, extends to the kind of action challenged here. "The exercise of such power must be entrusted to the court's sound discretion. As a result, review must be conducted under the deferential abuse-of-discretion standard." (*Ibid.*)

The trial court did not abuse its discretion as to its order. An examination of all the exhibits at one time when no witness is testifying constitutes a legitimate and practical alternative to the more usual review seriatim in the course of testimony. We recognize that the examination here took place in the jury room outside of the presence of all but the jurors. That fact does not undermine our conclusion. On the parties' stipulation, the court determined that it was not necessary to send its bailiff into the jury room to enforce its admonition. We see no reason to disagree.

Neither did the trial court abuse its discretion as to its direction. It is virtually axiomatic that the trier of fact must consider relevant evidence, whether or not it is "distasteful." Defendant's assertion notwithstanding, there was nothing improper about the court's words.[7]

E. *Prosecutorial Misconduct*

Defendant contends that the prosecutor engaged in misconduct.

 "What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant." (*People* v. *Benson, supra,* 52 Cal.3d at p. 793.)

[6]Defendant claims in effect that the trial court's ruling allowing the introduction of the crime scene and autopsy photographs in question was erroneous not only under the Evidence Code, but also under the United States Constitution—specifically, the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. At trial, defendant failed to make any objection whatever based on any federal constitutional provision. Be that as it may, as explained above, each of the photographs was relevant and none was unduly prejudicial. In our view, the admission of these items, whether considered separately or together, did not substantially implicate any of the cited federal constitutional provisions.

[7]Defendant may be understood to claim that the trial court's order and direction amounted to error under the United States Constitution as well as California law. We disagree. No federal constitutional violation appears to our review. Certainly, none is shown by defendant.

■ "It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People* v. *Benson, supra,* 52 Cal.3d at p. 794.) There are, indeed, certain exceptions. For example, the rule is inapplicable when the harm could not have been cured. (*Ibid.*) But there is no exception for capital trials as such. (See *People* v. *Gordon, supra,* 50 Cal.3d at p. 1256 [covering the issue of guilt]; *id.* at p. 1269 [covering the issue of penalty].)

■ We now turn to defendant's complaints. He claims that through certain comments in the course of summation, the prosecutor committed misconduct under *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].

■ In *Griffin,* the United States Supreme Court held that the privilege against self-incrimination of the Fifth Amendment prohibits any comment on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom, whether in the form of an instruction by the court or a remark by the prosecution. (380 U.S. at pp. 611-615 [14 L.Ed.2d at pp. 108-110].) The prohibition, however, does not extend to adverse comment on the defendant's silence prior to trial, unless the privilege is implicated. (*People* v. *Preston* (1973) 9 Cal.3d 308, 315 [107 Cal.Rptr. 300, 508 P.2d 300] [dealing expressly with instruction only].) Neither does it reach such comment on the defense's failure at trial to introduce evidence that could reasonably have been expected (*People* v. *Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959])—save only, of course, the testimony of the defendant himself.

We address at the threshold the question of the appropriate standard of review for prosecutorial comments.

Until recently, the United States Supreme Court made use of the "reasonable juror" test for scrutinizing ambiguous (or assertedly ambiguous) instructions under the United States Constitution, asking whether such a juror could have so construed or applied the words as to violate its provisions. (See, e.g., *Francis* v. *Franklin* (1985) 471 U.S. 307, 315-316 [85 L.Ed.2d 354-355, 105 S.Ct. 1965].) As required by the supremacy clause, we followed the court in this regard. (See, e.g., *People* v. *Mickey, supra,* 54 Cal.3d at p. 670.) Moreover, exercising our own authority, we employed the same standard in examining instructions under California law. (See, e.g., *People* v. *Mickey, supra,* at p. 672.) Finally—and most pertinent—we used this test against prosecutorial remarks generally, whether state law alone was involved or the federal charter itself was implicated. (See, e.g., *People* v. *Benson, supra,* 52 Cal.3d at p. 793.)

Early in its present term, the United States Supreme Court embraced the "reasonable likelihood" standard for reviewing ambiguous instructions under the United States Constitution, inquiring whether there is a reasonable likelihood that the jury misconstrued or misapplied the words in violation of that document. (*Estelle* v. *McGuire*, *supra*, __ U.S. at p. __ [116 L.Ed.2d at p. 399, 112 S.Ct. at p. 482].) We have already followed the court in this regard. (See *People* v. *Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].) We believe that the new test is proper for examining instructions under California law. We also deem it fit for use against prosecutorial remarks generally.[8]

■■■ Returning to the case at bar, we conclude that defendant's *Griffin* claim lacks merit.

There is not a reasonable likelihood that any of the comments could have been understood, within its context, to refer to defendant's failure to testify. Rather, some would have been heard to bear on defendant's manifestly "unprivileged" pretrial silence or equivocal response in the face of Flores's accusations during the January 16 conversation. The others would have been taken to relate to the defense's failure to introduce evidence that could reasonably have been expected.

We recognize that at a sidebar conference in the course of the summation, the trial court opined that the prosecutor was "getting awful close to" making comments of the kind proscribed by *Griffin*. But it proceeded to conclude that he did not actually utter such remarks. We have considered the record independently. In our view, the court's opinion is debatable. Its conclusion, however, is not.

■■■ Next, defendant claims that the prosecutor committed misconduct through certain comments he made in the course of summation dealing with the special circumstance allegations.

Specifically, defendant complains of the following: "The special circumstance is not—does not call for a finding of guilty or not guilty. Calls for merely a finding of true or not true." His argument is that the words may have been understood by the jury to imply that a special circumstance allegation need not be proved beyond a reasonable doubt—as indeed it must (see Pen. Code, § 190.4, subd. (a)).

---

[8]Although the same standard is applicable for instructions by the court and comments by the prosecutor, it must be used with recognition of the differing nature and force of its two objects in the eyes of the jury. We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.

We reject the point. The rule requiring assignment of misconduct and request for admonition was not satisfied, and no exception appears. Moreover, there is not a reasonable likelihood that the comment could have been taken to bear the implication defendant asserts. Indeed, other remarks uttered in the same portion of the argument made plain that the reasonable doubt standard applies to special circumstance allegations.

Defendant also complains of the following comment, which the prosecutor made with reference to the felony-murder special circumstance and, specifically, its requirement that a felonious purpose independent of murder must exist and hence that the underlying felony must not be merely incidental to the murder (e.g., *People* v. *Bonin* (1989) 47 Cal.3d 808, 850 [254 Cal.Rptr. 298, 765 P.2d 460]): "It's hard to conceive of such facts. The old Supreme Court did—" At this point, defense counsel interjected, "I will object to counsel referring to the source of any law that is in this case as being improper." The trial court responded, "Sustained." Defense counsel went on, "Ask the jury be admonished." The court told the prosecutor, "Proceed . . . ." The prosecutor then continued, "Thank you. These special circumstances will not be true if they were merely incidental. Under the facts in this case, or just about any case, I have a problem conceiving how that could happen. I don't think you will hear any issue raised about it." (Paragraphing omitted.)

We reject this point as well. To be sure, had not defense counsel interjected when he did, the prosecutor's reference to the "old" Supreme Court might well have developed into a harmful statement. But he did, and it did not.

Finally, defendant claims that the prosecutor committed misconduct through certain comments he made to the trial court during the hearings on defendant's *Wheeler* motion (see pt. II. A., *ante*) and his motion to exclude photographs (see pt. II. D., *ante*). The rule requiring assignment of misconduct and request for admonition was not satisfied, and no exception appears. Moreover, given a reasonable reading the remarks cannot be deemed improper. Defendant, in effect, charges the prosecutor with bad faith, but fails to make his proof.[9]

---

[9]Defendant claims that through the comments referred to above, the prosecutor committed misconduct under the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. The point is nothing more than a restatement of arguments addressed in the text, with other labels attached. Those arguments have failed. So does this. The remarks in question, whether considered separately or together, did not substantially implicate any of the cited federal constitutional provisions.

## F. *Denial of Motion for New Trial*

Defendant contends in substance that the trial court erred when it denied a motion he made for a new trial. The facts pertinent here are as follows.

It will be recalled that prior to trial, the court ruled that the January 16 conversation was generally admissible. On defendant's motion, it excluded certain portions of the conversation as irrelevant and unduly prejudicial. It did so because those portions contained references to two crimes allegedly committed by defendant: a burglary of unspecified premises (in actuality, the Owens apartment), and an assault on Flores.

At trial, an audiotape recording and a transcript of the January 16 conversation, with the excluded portions redacted out, were received in evidence as exhibits, and a transcript was given to each member of the jury. An unredacted audiotape recording and an unredacted transcript (with the excluded portions marked) were offered as exhibits for identification only.

On July 22, 1987, after the People completed their case-in-chief and just before they formally rested, the trial court sent the jury into the jury room for the midtrial examination of exhibits. (See pt. II. D., *ante.*) The jurors spent less than an hour in their task. They did not have access to an audiotape player. When they returned to open court, the People formally rested. Defendant then put on his case, calling a single witness, and rested. The court declared a recess.

On July 27, the People and defendant presented their summations and the trial court delivered its instructions. The jury commenced its deliberations.

On July 28, the jury returned its verdicts and findings. The trial court excused the jurors. Thereupon, it advised the People and defendant that "We've got a problem." The "problem" was this: just before the jury's return, the clerk—who was apparently quite upset—disclosed to the court that she had sent the unredacted audiotape recording and transcript of the January 16 conversation into the jury room for the midtrial examination on the mistaken belief that they had been received in evidence; she had discovered her mistake the previous day as she was preparing to send the exhibits into the jury room for deliberations. Defendant effectively moved for a new trial on the ground that the jury had received evidence out of court. The court deferred hearing the motion. With the agreement of the parties, it decided to call the jurors back for individual examination on the matter the next day without revealing the reason.

On July 29, the trial court informed the People and defendant that it had reconsidered its decision. It determined not to examine the jurors until after

the penalty phase and not to hear defendant's motion for new trial until after such examination. Its reasoning was that inquiry on the excluded portions of the January 16 conversation at that time would be disruptive, and might even result in the harm that the exclusion was intended to prevent. Defendant asked for immediate examination, but was refused. The court informed the jurors, who had returned on its summons, that their presence had proved unnecessary: it had temporarily resolved an unspecified "problem" that had arisen.

On August 3, defendant moved the trial court for an examination of the jury as to its exposure to certain reports in the press concerning his motion for new trial and the clerk's mistake. The court granted the request, but deferred the actual inquiry until after the penalty phase: it stated that it had admonished the jurors to avoid such reports, and presumed that they followed its direction. Defendant acquiesced. The penalty phase then commenced.

On August 6, the jury returned the verdict of death. The trial court discharged the jurors. It immediately added: ". . . I need twelve volunteers. The twelve of you. It appears that there is a possibility that some evidence came in at one stage in the proceeding that should not have come in. I have to find out whether or not it came in, and if so, whether or not you saw it."

Outside the presence of the jury, the trial court stated: "Then there will be a waiver from the defendant he need not be present . . . while we discuss this with the jury." Defense counsel made a response that both revealed and created confusion: "He doesn't want to waive time or anything, Judge. We can interview the jurors without his being there." Defendant and counsel then conferred. The court asked, "Mr. Clair, you have talked to your attorney about waiving your appearance while we question the jurors about the potential of error?" Defendant responded, "Yes." The court, "Okay. Now do you waive that—do you understand that, first?" Defendant, "Yes." The court, "Do you waive it?" Defendant, "Yes." The court, "Counsel join?" Counsel, "Yes."

Thereupon, the trial court examined each of the jurors individually outside the presence of the others, with the participation of the prosecutor and defense counsel. The result of the inquiry was this: the unredacted audiotape recording and transcript of the January 16 conversation had indeed been sent into the jury room for the midtrial examination; some of the jurors had noticed their presence; a few had recognized that the unredacted transcript differed from the redacted; none, it appears, had noted the precise references to the alleged burglary and assault themselves; further, none had apparently

been exposed to any news reports concerning defendant's motion for new trial and the clerk's mistake. The examination of the jurors was not conducted under oath.

On September 18, defendant moved the trial court to continue all proceedings, including the motion for new trial, to December 4. The court granted the request.

On December 4, the trial court conducted a hearing on defendant's motion for new trial. In open court, defendant filed a written motion based on, among other grounds, the jury's receipt of the unredacted audiotape recording and transcript of the January 16 conversation. Also in open court, the People filed written opposition, including an affidavit by each of the jurors that the answers he or she gave during the examination were true and accurate to the best of his or her recollection. The parties characterized the issue as jury misconduct: the defendant was required to show misconduct; if he succeeded, a presumption of prejudice arose; the People were then required to rebut the presumption if they could. The court followed the parties' characterization. It proceeded to deny the motion. It expressly determined that any presumption of prejudice had been rebutted. It impliedly determined that any error or other defect was not reversible.

 Defendant now claims that the trial court's denial of his motion for new trial was error.

 "When a verdict has been rendered or a finding made against the defendant," he may move for a new trial. (Pen. Code, § 1181.) Among the grounds on which he may rest is that "the jury has received . . . evidence out of court . . . ." (*Id.*, subd. 2.) A court may grant such a motion if and only if the defendant demonstrates the existence of an error or other defect that is reversible. (6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Judgment and Attack in Trial Court, § 3055, pp. 3779-3780.)

On appeal, a trial court's ruling on a motion for new trial is subject to review for abuse of discretion. (See, e.g., *People* v. *Cox* (1991) 53 Cal.3d 618, 694 [280 Cal.Rptr. 692, 809 P.2d 351; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221].)

 Applying that standard, we believe that the trial court did not err. Its ruling was reasonable. Indeed, any other would not have been.

We observe at the outset that the trial court mischaracterized the jury's receipt of the unredacted audiotape recording and transcript of the January

conversation as misconduct. "When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct." (*People* v. *Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865].) Rather, all that appears is ordinary error. (*Ibid.*) Certainly, there was no "improper *outside* influence[]." (*Id.* at p. 836, fn. 12, italics in original.)

Of course, the question of characterization is potentially significant. ▆ With misconduct, prejudice is presumed and reversal is required unless there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment. (*People* v. *Marshall, supra,* 50 Cal.3d at pp. 949-951; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108-1109 [269 Cal.Rptr. 530, 790 P.2d 1327].) By contrast, with ordinary error, prejudice must be shown and reversal is not required unless there is a reasonable probability that an outcome more favorable to the defendant would have resulted. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 836.) Manifestly, the standard is stricter for misconduct than for ordinary error. (*People* v. *Marshall, supra,* at p. 951; *People* v. *Holloway, supra,* at p. 1110.)

▆ In this case, however, the trial court's mischaracterization was not significant. Certainly, defendant cannot make any reasonable complaint about the court's approach: it applied a standard that was more favorable to his position than the appropriate test.

We return to the trial court's ruling. To be sure, the jury's receipt of the unredacted audiotape recording and transcript of the January 16 conversation was error. Of that there is no doubt. But the error was not reversible. As noted, the court impliedly made a determination to that effect. Reasonably so.

Indeed, when in the exercise of the appellate function we independently review the error itself for prejudice, we arrive at the same conclusion: there is no reasonable probability of a more favorable outcome.

First, it appears that the jury did not note the precise references to the alleged burglary and assault themselves in the January 16 conversation. Obviously, the jurors could not have discovered such matters on the audiotape: they did not have access to an audiotape player. Neither, it seems, did they actually discover them in the transcript.

Second and dispositive, the references to the alleged burglary and assault must be deemed insignificant. That conclusion follows even when the references are viewed in isolation: they are brief and unemphatic. It is virtually compelled when they are considered in context: they are overshadowed by the statements about the November 15 burglary and murder. We

recognize that the trial court had effectively determined that the references were unduly prejudicial. That determination—which we shall treat as sound——was simply an assessment that any benefit promised was not worth the cost threatened. It was not a decision that any harm would necessarily arise. As explained, we cannot conclude that any harm actually arose in this case.

Defendant argues that the trial court did indeed err by denying his motion for new trial. He attacks the outcome. But as stated, the jury's erroneous receipt of the unredacted audiotape recording and transcript of the January 16 conversation was not reversible: the references to the alleged burglary and assault must be deemed insignificant. He also attacks the process, finding fault with the court for deferring the examination of the jury, holding the inquiry outside his presence, failing to swear the just-discharged jurors, and conducting the questioning as it did. Whether considered separately or together, the complained-of deficiencies do not, and cannot, negate the crucial fact of the insignificance of the references.[10]

### G. Sufficiency of the Evidence as to the November 15 Burglary and Murder Convictions

 Defendant contends that the evidence was insufficient to support his convictions for the November 15 burglary and murder.

---

[10]Defendant claims in a footnote that the trial court erred by ordering the jurors to examine the exhibits midtrial and by directing them to "look at" the crime scene and autopsy photographs "even though it is distasteful to you." The point has already been rejected. (See pt. II. D., *ante.*)

Defendant claims in another footnote that the jury committed misconduct in the course of the midtrial examination. Again, his argument is perfunctory and unpersuasive.

Finally, defendant claims that the various acts and omissions detailed above amounted to error under various provisions of the United States Constitution—including the impartial jury, confrontation, and counsel clauses of the Sixth Amendment; the cruel and unusual punishments clause of the Eighth Amendment; and the due process clause of the Fourteenth Amendment. We find no violation. In any event, we find no basis for reversal. It is the rule that error of federal constitutional dimension is not automatically reversible, but rather is subject to harmless-error analysis under the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], viz., was the error harmless beyond a reasonable doubt? The rule covers all ordinary "trial error[s]." (*Arizona* v. *Fulminante* (1991) __ U.S. __, __-__ [113 L.Ed.2d 302, 330, 111 S.Ct. 1246, 1263-1264].) Excepted therefrom are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." (*Id.* at p. __ [113 L.Ed.2d at p. 331, 111 S.Ct. at p. 1265].) Each of the claimed errors is substantially based on the jury's receipt of the unredacted audiotape recording and transcript of the January 16 conversation. Each is plainly within the rule. And each, we conclude, must be held harmless beyond a reasonable doubt. The sole source of any cognizable detriment are the references to the alleged burglary and assault. But as explained above, those references must be deemed insignificant. Defendant attempts to move some of the claimed errors from the ambit of the rule into the exception, as by means of accusations, express and implied, that the trial court and the jury were not impartial. His efforts founder on the record, and must be dismissed out of hand.

■ "In reviewing the sufficiency of evidence, the question we ask is ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Italics in original.) (*People* v. *Guerra* (1985) 40 Cal.3d 377, 385 [220 Cal.Rptr. 374, 708 P.2d 1252], quoting *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting in turn *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781].)

■ Defendant's claim is not—and could not be—that the evidence was insufficient to establish that murder and burglary were, in fact, committed. Rather, it is that the evidence could not show that he was the person who committed the offenses. The point fails. The January 16 conversation was itself more than adequate. True, as defendant argues, the evidence was not unequivocal. Nevertheless, it was substantial enough to support a conclusion that defendant was indeed the perpetrator.

### III. Penalty Issues

Defendant raises a number of claims attacking the judgment as to penalty. As will appear, none is meritorious.

### A. *In Limine Ruling as to the Admissibility of Evidence of the Victim's Cerebral Palsy*

Prior to opening statements at the guilt phase, defendant moved the trial court *in limine* for an order prohibiting the People from introducing evidence they apparently intended to offer to show that the victim suffered from mild cerebral palsy. He claimed that the evidence was irrelevant or, if relevant, substantially more prejudicial than probative. The court initially denied the motion. Subsequently, after reconsidering the question *ex proprio motu*, it granted the request.

Before the penalty phase, the trial court held a hearing outside the presence of the jury to make *in limine* rulings on the admissibility of evidence to be offered by the People in aggravation. At the hearing, the People were given an opportunity to make "some offers of proof . . . as to what [they] intend[] to prove," and defendant was given a similar opportunity to make "objections."

Among the matters the People raised was the victim's cerebral palsy. The issues material to punishment under the 1978 death penalty law include, in the words of Penal Code section 190.3, "the nature and circumstances of the

present offense." The People claimed that the proffered evidence was relevant to this question. "[T]he vulnerability of the victim," argued the prosecutor, was "a circumstance of the offense." Defendant objected on the basis of California law, asserting that the proffered evidence did not come within the scope of Penal Code section 190.3 or any other provision.

The trial court ruled that it would allow the introduction of evidence of the victim's cerebral palsy. It reasoned, in substance, that such evidence was relevant to the circumstances of the crime under Penal Code section 190.3, and indeed related directly thereto.

Later, as noted, a stipulation on the victim's cerebral palsy was presented in the People's case in aggravation.

Defendant now contends that the trial court's ruling was erroneous. It appears that a determination of this sort, "which concerns the admissibility of evidence, is subject to review for abuse of discretion." (*People* v. *Mickey*, *supra*, 54 Cal.3d at p. 654.)

Under that standard, we find no error. Plainly, the circumstances of the crime under Penal Code section 190.3 include the manner in which the offense was committed. (See *People* v. *Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *id.* at p. 853 (conc. & dis. opn. of Mosk, J.).) The trial court could reasonably have concluded that evidence of the victim's cerebral palsy was relevant to the circumstances of the murder generally and to its manner specifically—and that, in fact, such evidence related directly thereto. Indeed, we ourselves so conclude. The victim's physical condition could tend to show that defendant mounted and executed his fatal attack without significant resistance—and therefore with unnecessary brutality. (Compare *People* v. *Carrera*, *supra*, 49 Cal.3d at pp. 336-337 [arriving at a similar conclusion as to similar evidence].)

Defendant argues error under California law. For the reasons stated above, we are not persuaded.

Defendant also argues error under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207].

In *Booth*, the United States Supreme Court concluded that the introduction of so-called "victim impact" evidence concerning, as pertinent here, the victim's personal characteristics and the emotional impact of the crime on the victim's family was generally violative of a criminal defendant's rights

under the cruel and unusual punishments clause of the Eighth Amendment—except to the extent such evidence related directly to the circumstances of the crime. (482 U.S. at pp. 502-509 [96 L.Ed.2d at pp. 448-452].) In *Gathers*, the court, following *Booth*, concluded that the presentation of argument touching on such matters was violative of those same rights. (490 U.S. at pp. 810-812 [104 L.Ed.2d at pp. 882-883].)

We reject defendant's point on procedural grounds. He failed to make any objection other than that based on Penal Code section 190.3. To be sure, *Gathers* had not been decided by the time of the ruling in question. But *Booth* had.

We also reject the point on the merits. Evidence of the victim's cerebral palsy was not barred by *Booth* or *Gathers*. As explained, it related directly to the circumstances of the crime. (Compare *People* v. *Carrera, supra*, 49 Cal.3d at pp. 336-337 [arriving at a similar conclusion as to similar evidence].) Dispositive, however, is the fact that in *Payne* v. *Tennessee* (1991) __ U.S. __, __ [115 L.Ed.2d 720, 737-739, 111 S.Ct. 2597, 2611], the court overruled *Booth* and *Gathers* as pertinent here. ██ Of course, "a new [federal constitutional] rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." (*Griffith* v. *Kentucky* (1987) 479 U.S. 314, 328 [93 L.Ed.2d 649, 661, 107 S.Ct. 708].) *Payne* is such a rule and this is such a case.

### B. *Claims Relating to the Owens Burglary*

Defendant makes a number of claims relating to the Owens burglary. We shall consider the points seriatim.

### 1. *Introduction*

██ The issues material to punishment under the 1978 death penalty law include, in the words of Penal Code section 190.3, "the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence." The requisite "criminal activity" must amount to conduct that violates a penal statute. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 772 [215 Cal.Rptr. 1, 700 P.2d 782].) Further, the necessary "force or violence" must be directed toward persons. (See *id.* at p. 776.)

Evidence of other criminal activity involving force or violence may be admitted in aggravation only if it can support a finding by a rational trier of

fact as to the existence of such activity beyond a reasonable doubt. This proposition is established as to the elements of the underlying crime. (*People* v. *Boyd, supra,* 38 Cal.3d at p. 778.) It follows from the "requirement for reasonable doubt instructions on proof of uncharged crimes at the penalty phase . . . ." (*Ibid.*) The proposition is apparently true as to the pertinent circumstances beyond the elements themselves. It follows from what appears to be a similar requirement for such instructions on proof of such facts. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 707 [276 Cal.Rptr. 788, 802 P.2d 278] [apparently recognizing a requirement of this sort]; *People* v. *Morales* (1989) 48 Cal.3d 527, 566 [257 Cal.Rptr. 64, 770 P.2d 244] [to similar effect].)

In *People* v. *Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423]—which was decided under the 1977 death penalty law (Stats. 1977, ch. 316, p. 1255 et seq.)—a plurality of this court stated that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove" the alleged other criminal activity involving force or violence, specifically, the elements of the underlying offense. (41 Cal.3d at p. 72, fn. 25 (plur. opn.).)

Prior to the penalty phase, as noted above, the trial court held a hearing outside the presence of the jury to make *in limine* rulings on the admissibility of evidence to be offered by the People in aggravation.

Among the matters the People raised was the Owens burglary. The prosecutor stated: "It has to do with the defendant's—I believe this is January 14th, 1985. It has to do with an incident where the defendant was observed breaking into a wom[a]n's apartment. And he was captured inside without any clothes on, naked in the victim's bed. There was a butcher knife—someone had used the bathroom after the two residents had left. There was a butcher knife sitting on the—on the toilet attached—in the bathroom attached to that bedroom. And I can't recall—if the court wants, I can give a more explicit definition. . . ."

The trial court asked, "Was he prosecuted on that?" The prosecutor answered, "No, he was not. That is an uncharged offense."

In response to the trial court's implied request for comment, defense counsel said that he was "familiar with the incident. . . . [A] 995 motion was granted with regard to that." He also said that the prosecutor "mis-[s]tates the evidence to the degree—I don't think the evidence showed . . . Mr. Clair was naked in the bed, but rather in his underclothes. . . ." He

went on: "But let's take all that together and assume that it's a—at least a 602.5, trespass of an occupied residence, or maybe even a residential burglary. Without more, that is not admissible as a circumstance in aggravation. There has to be evidence of violence or threat of violence to another person before it can be admissible. Secondly, there has to be proof beyond a reasonable doubt to the—the jury has to find beyond a reasonable doubt the truth of an uncharged, unadjudicated offense. And the fact that a 995 motion has already been granted with regard to that, I think precludes the introduction of that evidence in these proceedings."

At this point, the trial court asked: "Why was the 995 granted?" The prosecutor answered: "I had the case dismissed, because I wanted to proceed on this penalty phase only. I didn't want a separate burglary count pending against Mr. Clair. That would be severed. I saw no point to it."

The trial court then asked: "It wasn't dismissed by the court?" The prosecutor answered: "We conceded the 995. I told them to concede it because I didn't want it to be severed. Even if the 995 was denied, I didn't see any purpose in having that count floating around. There is no way that count could have been tried in my opinion with the—with this offense."

The trial court asked further: "You think you can prove that beyond a reasonable doubt?" The prosecutor answered: "Yes. And as far as [defense counsel]'s argument, I believe 190.3—it's not evidence just express, also implied threat. I forget the verbiage. But I think—obviously what I am after is if this is just a burglary, why is the kitchen knife in the bathroom? That is certain—it has a certain resemblance to the facts of the murder. This is a single lady, a fairly attractive lady who lives there. Although she's Black and lives there with her younger brother. And I feel that under the code section, there is evidence of an implied threat or menace by the defendant's conduct."

The trial court turned to defense counsel, impliedly soliciting his views. Counsel stated: "In response, Your Honor, the incident occurred, my recollection is, about ten o'clock in the morning. The lady had gone to work. The house was vacant. . . . There is no evidence that [defendant] put the knife in the bathroom. The knife wasn't in his possession when he was arrested some distance away, not even in the same room. And I—really, for the life of me, it does—I don't see how it rises to the level of being violence or threat of violence to another person. If the court is uncertain, based upon our offers of proof, about the admissibility of this evidence, I would request that the court have a hearing of the testimony before it's presented to the jury to determine whether or not it should be allowed."

The trial court then ruled: "I am going to allow it, but I am also going to—I don't see any reason for a hearing. [The prosecutor] knows what's there, what's not there. And if it turns out to be error, then he's caused it. Just leave it at that."

The People subsequently introduced evidence of the Owens burglary in aggravation as other criminal activity involving force or violence. As noted, Murline Owens and Milton Owens testified.

At that point, outside the presence of the jury, defendant moved to suppress evidence of statements he had made to the police relating to the Owens burglary as violative of *Miranda* v. *Arizona, supra,* 384 U.S. 436.

The trial court conducted an evidentiary hearing pursuant to Evidence Code section 402. Officer Courville gave testimony that, in large part, was substantially similar to what he would later present before the jury. That testimony has been described, and need not be rehearsed. (See pt. I. B., *ante.*) At the hearing, Courville also testified to the following noteworthy matters: when he approached defendant in the apartment with gun drawn and ordered him not to move, he intended only a temporary detention for investigation; and he was in the apartment only about 10 minutes before he effected the arrest.

Defendant and the People presented argument on the motion. Defendant claimed that Officer Courville should have advised him of his *Miranda* rights before he spoke to him in the apartment. It was evidently undisputed that a temporary detention for investigation—a so-called *"Terry* stop" *(Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868])—was warranted. "Under the Fourth Amendment, . . . a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' '[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation." ' Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *(Berkemer* v. *McCarty* (1984) 468 U.S. 420, 439 [82 L.Ed.2d 317, 332, 104 S.Ct. 3138], fn. and citations omitted.) What *was* disputed was whether Officer Courville's conduct went beyond a temporary detention for investigation.

The trial court proceeded to deny the motion. It determined that *Miranda* was not applicable at the apartment: ". . . *Miranda* didn't come into play

until [Officer Courville] actually did the *Mirandizing*." More particularly, it decided in effect that the "custodial interrogation" requisite to *Miranda* was absent. It impliedly found no "interrogation." And it expressly found no "custody": ". . . I find he was merely detained."

Subsequently, as noted, Officer Courville testified in the presence of the jury, relating, inter alia, certain statements by defendant. (See pt. I. B., *ante*.)

At the People's request, the trial court instructed the jury on burglary with intent to commit assault with a deadly weapon and/or rape. Also at their request, it instructed on the requirement of proof beyond a reasonable doubt with regard thereto.

### 2. *In Limine Ruling as to the Admissibility of Evidence of the Owens Burglary*

Defendant contends that the trial court's ruling *in limine* as to the admissibility of evidence of the Owens burglary was erroneous. As noted, it appears that a determination of this sort, which concerns the admissibility of evidence, is subject to review for abuse of discretion.

After close consideration, we find no error. The trial court did not abuse its discretion in ruling as it did.

The People's offer of proof was sufficient to establish that evidence of the Owens burglary was admissible in aggravation as other criminal activity involving force or violence.

Specifically, the offer showed evidence that would allow a rational trier of fact to make a determination beyond a reasonable doubt as to criminal activity. The offense in question is burglary in violation of Penal Code section 459, specifically, an entry into the apartment with a felonious intent.

The offer showed similarly substantial evidence as to force or violence. There was an implied threat. The reasonable inferences are these. Aware of the presence of those who came to the apartment in response to his arrival, defendant took up the knife in the kitchen against their imminent entry. He did so in order to avoid apprehension and make good his escape. Certainly, his purpose was *not* to employ the weapon simply to facilitate the taking of property: he evidently came equipped with a screwdriver to that end. Not only did he take up the knife, but he also carried it around the apartment as he seemingly readied himself for action. Apparently deciding at the last moment not to risk a physical confrontation but to try to lie himself out of

trouble, he cast the weapon away before he actually put it to use. Thus, he chose not to follow through. But he did not, and could not, undo what he had already done. He made an implied threat to use the knife against anyone who might interfere. (Compare *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1186-1187 [270 Cal.Rptr. 286, 791 P.2d 965] [implied threat of force or violence: possession of knife in California Youth Authority facility]; *People* v. *Harris* (1981) 28 Cal.3d 935, 962-963 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn.) [same: possession of garotte and knife in jail (decided under the identically worded provision of former Pen. Code, § 190.3, Stats. 1977, ch. 316, § 11, p. 1259)].)

Defendant challenges the ruling in and of itself. He claims the offer of proof was lacking as to criminal activity. He cites the People's concession of insufficiency with regard to his motion to set aside the information under Penal Code section 995. The concession there, however, is not dispositive here. He also cites a comment by the trial court in denying his motion for new trial that "you have a strong argument" as to insufficiency. Although it called the argument "strong," the court found it unpersuasive. So do we. To the extent that his attack is aimed at any asserted absence of facts as to intent to commit assault with a deadly weapon or rape, it is rejected at the threshold: he did not raise a sufficient objection to that effect below. Further, he claims that the offer of proof was lacking as to force or violence. To be sure, the implied threat was not executed. But it was an implied threat nonetheless. Contrary to his suggestion, there is no requirement of a face-to-face confrontation.

■ Defendant also challenges the process whereby the ruling was made.

He argues that the trial court did not decide the question of the sufficiency of the People's offer of proof itself, but improperly "delegated" the issue to the People. The record—which is set out above—shows that the court did indeed resolve the issue itself. Given a reasonable reading, the court's comment, "I don't see any reason for a hearing. [The prosecutor] knows what's there, what's not there," implies little more than an acceptance of the accuracy and adequacy of the offer of proof.

Defendant argues in addition that the trial court was required, under the plurality opinion in *Phillips*, to conduct a "preliminary inquiry" whether the People's evidence of the Owens burglary was "substantial." (41 Cal.3d at p. 72, fn. 25 (plur. opn.).) Not so. *Phillips* did not impose such a requirement. (*People* v. *Jennings* (1991) 53 Cal.3d 334, 389 [279 Cal.Rptr. 780, 807 P.2d 1009].) The language in question states only that a "preliminary inquiry"

*"may be advisable."* (41 Cal.3d at p. 72, fn. 25, italics added (plur. opn.).) Further, *Phillips* could not impose any such requirement. The pertinent language did not command the support of a majority of the court, and was clearly dictum.[11]

### 3. *Denial of Motion to Suppress Defendant's Statements Relating to the Owens Burglary*

Defendant contends that the trial court erred by denying his motion to suppress his statements relating to the Owens burglary as violative of *Miranda.*

The trial court's determination that *Miranda* was not applicable at the apartment is reviewed thus: the conclusion itself is examined independently, the underlying findings are scrutinized for substantial evidence. (E.g., *People* v. *Leyba, supra,* 29 Cal.3d at pp. 596-597 [dealing with a determination that a defendant's Fourth Amendment rights had been violated].) A determination whether police conduct amounted to a temporary detention for investigation or something more is reviewed independently. (Cf. *United States* v. *Harrington* (9th Cir. 1991) 923 F.2d 1371, 1373 [applying independent review under federal standards for Fourth Amendment analysis]; *United States* v. *Buffington* (9th Cir. 1987) 815 F.2d 1292, 1300 [same].) By contrast, "findings on whether there was custodial interrogation . . . are reviewed for substantial evidence . . . ." (*People* v. *Mickey, supra,* 54 Cal.3d at p. 649.) So too, it appears, are the underlying findings on whether there was "custody" and "interrogation."

Having scrutinized the matter carefully, we find no error in the trial court's denial of the motion to suppress.

---

[11]Defendant claims in effect that the trial court's *in limine* ruling was erroneous not only under California law, but also under the United States Constitution—specifically, the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. At trial, defendant failed to make any objection whatever based on any federal constitutional provision. Moreover, in our view, the ruling did not substantially implicate any of the cited guaranties.

Even if the trial court's *in limine* ruling had been erroneous under California law or the United States Constitution or both, it would not have been prejudicial. "State-law error . . . bearing . . . on penalty in a capital case . . . is reviewed under the 'reasonable possibility' standard of *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135]. Error of federal constitutional dimension, by contrast, is scrutinized under the 'reasonable doubt' standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. The two tests are the same in substance and effect." (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 965, citation omitted.) The application of both standards yields but one result: no harm. The actual—and proper—focus of the penalty phase was defendant and his capital crime. To be sure, the evidence of the Owens burglary was not insubstantial. Nevertheless, it added little, if anything, of marginal significance to the picture presented of the murder and the murderer.

After independent review, we agree with the trial court's determination that *Miranda* was not applicable at the apartment. The *Miranda* court itself declared that "General on-the-scene questioning as to facts surrounding a crime . . . is not affected by our holding." (384 U.S. at p. 477 [16 L.Ed.2d at p. 725].) The inquiry at the apartment was questioning of this sort.

Further, we believe, as we explain below, that the trial court's decision that "custodial interrogation" was lacking was supported by substantial evidence. And of course, "Absent 'custodial interrogation,' *Miranda* simply does not come into play." (*People* v. *Mickey, supra,* 54 Cal.3d at p. 648.)

Specifically, there was substantial evidence that "custody" was absent. ▮ True, the term "encompasses any situation in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (*People* v. *Mickey, supra,* 54 Cal.3d at p. 648, quoting *Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) Generally, however, it does not include a temporary detention for investigation. (See *Berkemer* v. *McCarty, supra,* 468 U.S. at pp. 439-440 [82 L.Ed.2d at p. 334].) Such a detention, as noted, allows "the officer . . . [to] ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." (*Id.* at p. 439.) ▮ After independent review, we agree with the trial court that Officer Courville's action amounted only to a temporary detention for investigation. Courville did no more than was permitted, asking defendant who he was, whether he had identification, if he lived in the apartment, what he was doing there, and if he knew the resident or residents. That Courville approached defendant—who was under the covers in the bed in the bedroom—with gun drawn, and ordered him not to move, was altogether reasonable under the circumstances. Certainly, this fact alone does not transform the situation into one of "custody." (See *People* v. *Taylor* (1986) 178 Cal.App.3d 217, 230 [223 Cal.Rptr. 638] [recognizing that it is not the case that "*Miranda* warnings must be given in each instance where police officers initially use weapons or other force to effect an investigative stop"].) Neither do the other facts, whether considered singly or together.

There was also substantial evidence that "interrogation" was absent. ▮ To be sure, the term " 'refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " (*People* v. *Mickey, supra,* 54 Cal.3d at p. 648, quoting *Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682], fn. omitted.) But it apparently does not extend to "inquiries"—like those here—that are essentially "limited to the purpose of identifying a

person found under suspicious circumstances or near the scene of a recent crime[.]" (1 LaFave & Israel, Criminal Procedure, *supra*, § 6.7, at pp. 504-505.)

### 4. *Sufficiency of the Evidence of the Owens Burglary*

Defendant contends that the evidence of the Owens burglary was insufficient to allow a rational trier of fact to determine beyond a reasonable doubt that he committed burglary with intent to commit assault with a deadly weapon or rape.

Of course, we do not *know* whether any of the jurors made such a determination. We shall nevertheless presume that at least one did so. Otherwise, we would run an unacceptable risk of rejecting a potentially meritorious claim by gratuitously denying the existence of its factual predicate.

Even viewing the evidence, as we must, in the light most favorable to the People, we do not believe that a rational trier of fact could have determined beyond a reasonable doubt that defendant committed burglary with intent to commit assault with a deadly weapon or rape.

To be sure, the question would not be close as to simple burglary, i.e., an entry with *any* felonious intent, involving force or violence. Clearly, defendant entered the Owens apartment with intent to steal, and later impliedly threatened to use the knife he found therein. The evidence is more than sufficient in this regard.

But the question here concerns burglary *with intent to commit assault with a deadly weapon or rape.* The facts allow uncertainty whether defendant entered with either intent: he arrived *after* Murline and Milton Owens had left the apartment and *without* the knife that he would later find. Certainly, the facts are too slight to support an inference that he entered with either intent *beyond a reasonable doubt.*

We now turn from the fact of insufficiency to its consequences.

As explained, a rational trier of fact could surely have found other criminal activity involving force or violence, but not under the label provided here.

The question then becomes, could any juror's consideration of the inappropriate label be deemed prejudicial? The answer must be negative. The

actual—and proper—focus of the penalty phase was defendant and his capital crime. To be sure, the evidence of the Owens burglary was not insubstantial. Nevertheless, it added little, if anything, of marginal significance to the picture presented of the murder and the murderer. Similarly, any inappropriate label attached to the burglary would have added little. Therefore, a label of this sort could not have affected the outcome within any reasonable possibility, and hence must be held harmless beyond a reasonable doubt.[12]

## C. *Denial of Guilt Phase Motion to Exclude Photographs*

 Defendant contends that the trial court's "erroneous" denial of his guilt phase *in limine* motion to exclude certain crime scene and autopsy photographs was prejudicial as to penalty. (See pt. II. D., *ante*.) As we

---

[12]In a related point, defendant claims that the trial court erred by instructing on burglary with intent to commit assault with a deadly weapon and/or rape. There was indeed error: the instructions were without adequate evidentiary support. But there was no prejudice. In part, the instructions may have caused one or more of the jurors to approach the evidence of the Owens burglary under undue restrictions to defendant's possible benefit. But in other part, they may have led them to attach an inappropriate label to the incident to his possible detriment. Nevertheless, a label of this sort could not have affected the outcome within any reasonable possibility, and hence must be held harmless beyond a reasonable doubt.

Defendant further claims that the trial court erred by failing to instruct sua sponte on criminal trespass in violation of Penal Code section 602.5—unauthorized entering or remaining in a noncommercial dwelling. In the absence of a request, a court is under no obligation to give an instruction of this sort. (E.g., *People v. Grant* (1988) 45 Cal.3d 829, 852 [248 Cal.Rptr. 444, 755 P.2d 894].) Accordingly, the omission of such an instruction under such circumstances is not error. Here, defendant did not make a request—nor does he assert otherwise. We note the following in passing. Immediately after making the *in limine* ruling considered above, the court asked defense counsel, "Want trespass . . . ?" Counsel answered, "Well, I don't want the court to allow the evidence at all. If the court is going to allow it, I think a trespass instruction would be appropriate." But some days later, when the penalty phase charge was discussed at length on the record, counsel accepted instructions that did not cover criminal trespass. The reason is not hard to discern. Counsel apparently desired to put the jury to what he evidently, and reasonably, believed to be the hard choice of burglary with intent to commit assault with a deadly weapon and/or rape—and not to allow them what he evidently, and reasonably, believed to be the easy choice of criminal trespass. In view of the foregoing, we conclude that defendant did not effectively request the court to instruct on criminal trespass or, if he did, he must be deemed to have withdrawn the matter from consideration.

Defendant also claims in perfunctory fashion that the trial court erred by failing to instruct sua sponte on the inadmissibility of evidence of other crimes under Evidence Code section 1101 to prove burglary with intent to commit rape. There was no error. Such evidence was not inadmissible under that provision for that purpose. (Evid. Code, § 1101, subd. (b).)

Finally, defendant claims that the trial court's giving and omitting of the instructions referred to above amounted to error not only under California law, but also under the United States Constitution—specifically, the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment. We disagree. To our mind, the instructions in question did not substantially implicate any of the cited federal constitutional provisions. Certainly, they would not require reversal.

concluded above, there simply was no error. Hence, the claim here fails. No error, no prejudice.

After close consideration, we are of the opinion that the admission of the challenged photographs did not offend California law or the United States Constitution. We recognize that the evidence in question graphically revealed the effect of the offense on the victim. But contrary to defendant's assertion, matter of this sort is included by Penal Code section 190.3 within the circumstances of the crime. (See *People* v. *Marshall, supra,* 50 Cal.3d at p. 929.) Further, it is not excluded by the cruel and unusual punishments clause of the Eighth Amendment, even as construed in the now largely overruled *Booth* and *Gathers* cases. (*People* v. *Benson, supra,* 52 Cal.3d at p. 797; see *People* v. *Marshall, supra,* at p. 929.) Neither is it barred by the due process clause of the Fourteenth Amendment. (See *Payne* v. *Tennessee, supra,* __ U.S. __ at p. [115 L.Ed.2d at p. 735, 111 S.Ct. at p. 2608].) Defendant's attack on the evidence proves unsuccessful.

D. *In Limine Ruling as to the Propriety of the People's Cross-examination of Dwana Paul*

Pursuant to Penal Code section 190.3, the People gave notice to defendant prior to trial that they intended to introduce aggravating evidence relating to matters including the following: that on or about August 27, 1983, defendant committed the unadjudicated—but evidently charged—offenses of rape, forcible oral copulation, and robbery against Beverly E. in New Orleans. It appears that the prosecutor provided defense counsel with police reports and an arrest warrant pertaining to such offenses. Prior to the penalty phase, the People elected not to introduce the evidence in question, apparently because it was insufficient.

As noted, in his case in mitigation defendant called Dwana Paul. On direct examination, Paul testified, inter alia, that defendant was "compassionate, warm and considerate of other people."

During the course of cross-examination, but outside the presence of the jury, the People moved the trial court for a ruling *in limine* allowing them to question Paul on the Beverly E. offenses.

The motion was argued in light of *People* v. *Hempstead* (1983) 148 Cal.App.3d 949 [196 Cal.Rptr. 412], among other cases. In pertinent part, the *Hempstead* court held as follows. ▪▪ "When . . . a witness is called to express an opinion as to the good character of the defendant, the prosecution must have the opportunity [under the Evidence Code] to let the jury

test the validity of the opinion or the weight to be given to it by asking whether the holder of the opinion has knowledge of events or acts which have indisputably occurred." (*Id.* at p. 954.) At the threshold, the prosecution must demonstrate to the court its good faith in this regard. (*Id.* at p. 953.) "If allowing these questions and answers would create a substantial danger of undue prejudice to the defendant, the trial judge has the discretion to preclude them under Evidence Code section 352. When such cross-examination of a good-character witness is permitted, the jury should be instructed that such questions and answers of a character witness are to be considered only for the purpose of determining the weight to be given to the opinion or testimony of the witness." (*Id.* at p. 954.)

The trial court granted the motion. It determined, inter alia, that Paul effectively gave good-character evidence by means of opinion; that *Hempstead* was applicable; further, that that decision in fact controlled, its conditions having been satisfied; and finally, that Evidence Code section 352 did not bar the proposed questioning as substantially more prejudicial than probative.

Before the cross-examination of Paul resumed, the trial court gave the jury the limiting instruction referred to in *Hempstead*.

On resumption, the prosecutor asked, "Well, . . . as I recall, you used the words in describing the defendant as compassionate[,] loving and warm; is that correct?" Paul answered, "Yes." He asked, "I take it that that is from your personal experiences with him—" Interrupting, she answered, "Yes." He proceeded to ask, "In regards to the opinion and the character traits you have testified about, have you heard that Mr. Clair has been charged in the state of Louisiana, in the city of New Orleans, with the crime of rape and forcible oral copulation of one Beverly [E.] that allegedly occurred on August 27th, 1983?" Paul answered, "Yes." He then asked, "Did those facts in any way affect your opinion of Mr. Clair's character?" She answered, "No."

Defendant now contends that the trial court's ruling was erroneous. As noted, it appears that a decision of this sort, which concerns the admissibility of evidence, is subject to review for abuse of discretion. Underlying determinations, of course, are scrutinized pursuant to the test appropriate thereto.

After review, we find no error. Each of the determinations referred to above is sound. All of them together more than adequately support the ruling.

First, under any standard Paul did indeed effectively give good-character evidence by means of opinion. Defendant argues to the contrary. His hyper-technical parsing of her testimony utterly fails. Indeed, in her resumed cross-examination, Paul revealed that she herself believed she had given such evidence.

Second, *Hempstead* is applicable. We have reviewed this determination independently as the resolution of a pure legal question. *Hempstead*'s reasoning is broad in scope. True, the analysis appears in a noncapital case. But that fact is not limiting. Relying on *People* v. *Boyd, supra,* 38 Cal.3d 762, 772-776, *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 790-792 [230 Cal.Rptr. 667 [726 P.2d 113], and their progeny, defendant argues that the cross-examination the People sought to conduct was not admissible under Penal Code section 190.3 as evidence in aggravation. But as shown above, the inquiry did not purport to introduce such evidence and in fact did not do so. In *People* v. *Ramirez, supra,* 50 Cal.3d 1158, we made plain that cross-examination like that under review must be "specific" and must "relate directly to a particular incident or character trait defendant offers in his own behalf." (*Id.* at p. 1193, internal quotation marks omitted.) Plainly, the inquiry here was of this sort.

Third, under any standard *Hempstead* controls.

To begin with, Paul "express[ed] an opinion as to the good character of the defendant" (*People* v. *Hempstead, supra,* 148 Cal.App.3d at p. 954), viz., that he was "compassionate, warm and considerate of other people."

Further, the prosecutor sought to ask whether Paul "ha[d] knowledge of events or acts which ha[d] indisputably occurred" (*People* v. *Hempstead, supra,* 148 Cal.App.3d at p. 954), viz., that defendant had been charged with rape and forcible oral copulation. Defendant may be understood to argue that the requisite "events or acts" cannot include allegations. That is not the case. (See *People* v. *Qui Mei Lee* (1975) 48 Cal.App.3d 516, 526-527 [122 Cal.Rptr. 43]; *People* v. *Aguilar* (1973) 32 Cal.App.3d 478, 483 [108 Cal.Rptr. 179] (per Kaus, P. J.); cf. Graham, Handbook of Federal Evidence (3d ed. 1991) § 608.5, pp. 468-469 (hereafter Graham) [stating that under Fed. Rules Evid., rule 608(b)(2), 28 U.S.C., "[t]he character witness . . . may be cross-examined concerning familiarity with . . . arrests, rumors, reports, indictments, etc."].)

Also, the questioning the prosecutor proposed could reasonably have "let the jury test the validity of the opinion or the weight to be given to it" (*People* v. *Hempstead, supra,* 148 Cal.App.3d at p. 954): the charges at issue

can certainly be judged inconsistent with compassion, warmth, and consideration. (Compare Graham, *supra*, § 608.5, at p. 469 ["Such facts" as "arrests, rumors, reports, indictments, etc." "have a natural bearing upon . . . the character witness' opinion . . . . Lack of familiarity with such facts is relevant to an assessment of the basis for the character witness' testimony. Familiarity with such matters explores the character witness' standard of 'truthfulness' or 'untruthfulness.'" Fn. omitted.].)

Moreover, the prosecutor demonstrated good faith. At trial it was apparently undisputed, at least for present purposes, that defendant had in fact been charged. Now for the first time, defendant denies good faith. He is too late.

Finally, under the plainly applicable abuse-of-discretion standard, Evidence Code section 352 raises no bar. Again, defendant argues to the contrary. The very facts, as stated above, prove him wrong. The proposed cross-examination was not substantially more prejudicial than probative.[13]

### E. *Prosecutorial Misconduct*

 Defendant contends that throughout his summation, the prosecutor engaged in misconduct.

Having reviewed the summation in its entirety, we reject the claim on procedural grounds. The rule requiring assignment of misconduct and request for admonition was not satisfied: defense counsel did not make any objection of any kind on any basis. Further, no exception appears. For instance, contrary to defendant's assertion, any "harm" was readily curable. And as stated above, there is no exception for capital trials—not even for the penalty phase thereof (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1269).

We also reject the claim on the merits. Defendant complains of pervasive misconduct in the summation violative of California law and also the United

---

[13]Defendant claims that the trial court's ruling was erroneous not only under the Evidence Code, but also under, inter alia, the United States and California Constitutions—including the confrontation clause of the Sixth Amendment and article I, section 15; the counsel clause of the Sixth Amendment; the cruel and unusual punishments clause of the Eighth Amendment; and the due process clause of the Fourteenth Amendment. At trial, defendant failed to make any objection whatever based on any of these provisions. Moreover, in our view, the ruling did not substantially implicate any of these guaranties.

Defendant also claims that the prosecutor committed misconduct by making the motion in question and subsequently cross-examining Paul on the Beverly E. offenses. We reject the point out of hand. The rule requiring assignment of misconduct and request for admonition was not satisfied, and no exception appears. Further, there was simply no misconduct. The crucial predicate of defendant's complaint is an assertion that we have already found wanting, viz., that the proposed cross-examination was improper.

States Constitution. The impropriety that he assertedly finds is not supported by the record. "A prosecutor," of course, "has wide discretion to argue the merits of a case . . . ." (*People* v. *Warren* (1988) 45 Cal.3d 471, 485, fn. 1 [247 Cal.Rptr. 172, 754 P.2d 218].) That discretion was not abused here.

Defendant's argument against our conclusion is unpersuasive, being at once excessively subtle in its consideration of the words of the summation in the abstract and insufficiently precise in its treatment of the language in its context.

For example, defendant's claim notwithstanding, there is not a reasonable likelihood that the jury would have understood the prosecutor to "urge[]" it "to return a sentence of death based on [defendant]'s failure to testify and express remorse, in violation of the Fifth Amendment as well as California's sentencing statute." Rather, it would have heard an unobjectionable statement of a reasonable inference from the evidence actually adduced at trial, to the effect that defendant displayed remorselessness during and after the murder.

Also, there is not a reasonable likelihood that the jury would have understood the prosecutor to "inject[] [defendant]'s race into the sentencing deliberations, in violation of the Equal Protection Clause" and other provisions of the United States Constitution as well as (apparently) California law. Rather, in part it would have heard unobjectionable statements of reasonable paraphrases of, inferences from, or comments on, the evidence actually adduced at trial. In other part, it would have heard a similarly unobjectionable, prophylactic remark on the requirement of "color-blindness" in determining penalty.

Further, there is not a reasonable likelihood that the jury would have understood the prosecutor to give what was in fact a misleading presentation of the substance and character of the penalty determination under California law and the United States Constitution. Rather, it would have heard an unobjectionable explication of the subject.

Neither is there a reasonable likelihood that the jury would have understood the prosecutor to "exhort[]" it "to restrict its consideration of [the nature, scope, or existence of] mitigating evidence, in violation of the Eighth Amendment and [other] capital sentencing requirements." Rather, it would have heard an unobjectionable statement of a reasonable comment on the weight to be given to the mitigating evidence actually adduced at trial. It is indeed true that "under the cruel and unusual punishments clause of the Eighth Amendment, the scope of potentially mitigating evidence includes

'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " (*People v. Ashmus, supra,* 54 Cal.3d at p. 1008.) It is also true that "[s]uch evidence may carry potentially mitigating weight whether or not it has any tendency to extenuate the defendant's guilt." (*Ibid.*) Defendant's assertion notwithstanding, the argument did not bear a contrary message.

Likewise, there is not a reasonable likelihood that the jury would have understood the prosecutor to "urge[]" it "to find aggravation based on charges of which [defendant] had been acquitted [i.e., the felony-murder-rape special circumstance], in violation of the Double Jeopardy Clauses of both state and federal constitutions, and in violation of capital sentencing rules." Rather, at worst it could have heard an unobjectionable statement of a reasonable inference from the evidence actually adduced at trial, to the effect that defendant's conduct culminating in the murder may have been sexually motivated.[14]

Also, there is not a reasonable likelihood that the jury would have understood the prosecutor to "misstate[] the evidence," in violation of California law and the United States Constitution. Rather, it would have heard unobjectionable statements of reasonable paraphrases of, inferences from, or comments on, the evidence actually adduced at trial.

Lastly, there is not a reasonable likelihood that the jury would have understood the prosecutor to make a "victim impact" argument improper under California law and the United States Constitution. Rather, it would have heard unobjectionable statements of reasonable inferences from, or comments on, the evidence actually adduced at trial.[15]

### F. *Instructions on the Penalty Factors*

In the course of its charge at the penalty phase, the trial court instructed the jury that "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case." It further instructed that "You shall consider, take into account and be guided by" specified factors stated in Penal Code section 190.3, "if applicable," including "[a]ny . . . circumstance which extenuates the gravity of the crime even though it's not a legal excuse for the

---

[14]To the extent that defendant seeks to attach a label other than "prosecutorial misconduct" to the substance of his complaint in this regard, he is unsuccessful. Contrary to his claim, there was no double jeopardy or related violation.

[15]In a related point, defendant claims that the trial court erred by failing to intervene sua sponte in an attempt to prevent or cure the asserted prosecutorial misconduct. But as we have concluded, there was no impropriety.

crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

██ Defendant contends that the foregoing instructions were erroneous under the cruel and unusual punishments clause of the Eighth Amendment. Under that provision, "the sentencer . . . [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 98 S.Ct. 2954], italics in original (plur. opn. by Burger, C. J.); accord, *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 102 S.Ct. 869]; *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 106 S.Ct. 1669].) Defendant asserts that the instructions here had such a preclusive effect.

We reject the claim. There is not a reasonable likelihood that the jury construed or applied the challenged instructions as defendant maintains. The jurors were expressly told that "In determining which penalty is to be imposed on defendant, you shall consider *all* of the evidence which has been received during any part of the trial of this case" (italics added)—which plainly includes all potentially mitigating evidence, both "extenuating" and "nonextenuating." They were also expressly told that "You shall consider, take into account and be guided by" various factors, "if applicable," including "[a]ny . . . circumstance which extenuates the gravity of the crime even though it's not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

Defendant argues to the contrary. In support, he cites the language of the instructions directing the jury to take into account the "applicable" penalty factors. We are not persuaded. The jury would have understood the cited language to require it to determine the existence of any aggravating or mitigating circumstances. ██ ██ ██ Defendant's assertion notwithstanding, there is not a reasonable likelihood that the jury would have taken the words to negate or otherwise affect the express mandate that "In determining which penalty is to be imposed on defendant, you shall consider *all* of the evidence which has been received during any part of the trial of this case." (Italics added.)[16]

---

[16]Defendant claims in perfunctory fashion that "the evidence was insufficient to support the death verdict." His point appears to be that he was not eligible for the penalty of death. We

## G. *Denial of Verdict-modification Application*

Defendant made an application for modification of the verdict of death under Penal Code section 190.4, subdivision (e). The trial court denied the request. Defendant contends that the court erred by so doing.

■ "In ruling on a verdict-modification application, the trial judge is required by section 190.4(e) to 'make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.' That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 942, citations omitted.) Further, in deciding the question, the trial judge must "specify reasons . . . sufficient 'to assure thoughtful and effective appellate review.' " (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 794.)

■ On appeal, we subject a ruling on a verdict-modification application to independent review. (*People* v. *Ashmus, supra,* 54 Cal.3d at pp. 1006-1007.)

■ Having conducted such scrutiny here, we find no error. The trial court gave a lengthy statement of reasons. It concluded: "[C]onsidering all the evidence and by independent review, the court's personal assessment [is] that the factors in aggravation"—largely, the circumstances of the crime—"beyond all reasonable doubt outweigh those in mitigation; and further, the court independently finds that the evidence in aggravation is so substantial as compared to the evidence in mitigation that it warrants death and not life without possibility of parole." The court satisfied the requirements of Penal Code section 190.4, subdivision (e). Its denial of modification was sound.

In arguing to the contrary, defendant claims that the trial court erroneously considered the absence of a certain potentially mitigating circumstance, viz., mental impairment, to amount to an aggravating circumstance in and of itself. He cites the following language in the statement of reasons: "The court finds and agrees with the jury that in terms of aggravation, the facts . . . with regard to the killings [*sic*] are brutal and inhumane; and the court further finds that he had the ability to conform his conduct to the requirements of law." Of course, "aggravation is *not* established by the absence of

disagree. "[D]eath eligibility is established when"—as here—"the defendant is convicted of murder in the first degree under at least one special circumstance." (*People* v. *Mickey, supra,* 54 Cal.3d at p. 677.)

mitigation . . . ." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 944, italics in original.) Given a reasonable reading, the quoted words reveal nothing more than a determination—which was altogether sound—that the circumstances of the crime, including defendant's evident mental capacity, were aggravating. They simply do not suggest any misconception as to aggravation and mitigation.

Defendant also claims that the trial court erroneously considered evidence of the Owens burglary in aggravation as other criminal activity involving force or violence. The record is silent on the precise point. The words defendant cites may refer to the Daspit armed robbery only. Any error, however, was clearly nonprejudicial under both the "reasonable possibility" and "reasonable doubt" standards.

Finally, defendant claims that the trial court erroneously believed that potentially mitigating evidence embraces only "extenuating" facts, which related to the crime itself, and as a result failed to consider "nonextenuating" facts, which bore on his background and character. We disagree.

Plainly, the trial court had a proper understanding of the broad scope of potentially mitigating evidence. As noted, it correctly described its ambit to the jury in the penalty phase charge. Surely, it knew the meaning of its own words. True, it stated, for example, that "there was no circumstance to extenuate the gravity of the crime . . . ." A statement of this sort "does not imply a belief that only such evidence as may extenuate the gravity of the crime can be mitigating. It merely declares that the mitigating evidence actually offered by defendant was not in fact extenuating." (*People* v. *Marshall, supra,* 50 Cal.3d at p. 943.)

Further, the trial court actually considered "nonextenuating" facts bearing on defendant's background and character, such as the following: defendant "was raised in a poor environment"; "has certain intellectual limitations"; "had cultural deprivation"; "was beaten by his step father" [*sic*: apparently, his uncle Jack]; and "did a reading of the Bible at the jail house and took some tests concerning the Bible." That the court immediately proceeded to find that "there were no factors in mitigation" shows only an assessment that the "nonextenuating" facts were insufficiently weighty, not a conclusion that they were nonexistent or immaterial.

## H. *Constitutionality of the 1978 Death Penalty Law*

Defendant contends that the 1978 death penalty law is facially invalid under the United States and California Constitutions, and hence that the judgment of death entered pursuant thereto is unsupported as a matter of law. "Having time and again considered claims such as defendant's in a series of decisions beginning with *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113], we may summarize the views expressed therein thus: as a general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. In his argument here, defendant raises certain specific constitutional challenges. But he recognizes that in the *Rodriguez* series of cases, we have rejected each and every one. We see no need to rehearse or revisit our holdings or their underlying reasoning. ██ ██ The point fails." (*People* v. *Ashmus, supra*, 54 Cal.3d at pp. 1009-1010.)[17]

## IV. DISPOSITION

Having found no reversible error, we conclude that the judgment must be affirmed.

---

[17]Defendant contends that there was "cumulative" error and/or prejudice. The claim is an attempt to show that some or all of the points considered above require reversal. It does not succeed.

On behalf of defendant, the People raise the contention that the sentence on the serious-felony enhancement must be set aside because no finding on the underlying prior-conviction allegation appears. We disagree. During the penalty phase, defendant waived trial by jury on the allegation and consented to trial by the court. At the same time, he stipulated that in deciding the issue, the court could consider the evidence that the People intended to introduce before the jury in order to prove the conviction as a circumstance in aggravation under the rubric of a prior felony conviction. Such evidence was in fact introduced, including what the court referred to as "certified copies of [the] conviction." The question was subsequently argued to the court. At sentencing, the court impliedly—but sufficiently—rendered a finding of true as to the allegation when it imposed an enhancement *expressly* for the underlying prior conviction. Contrary to defendant's claim, there is no failure of proof. Neither is there any reason to vacate the enhancement—and less reason still to disturb the penalty of death.

Lastly, we declare that "Whether or not expressly discussed, we have considered and rejected . . . all of the assignments of error presented in all of defendant's briefs." (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1252 [283 Cal.Rptr. 144, 812 P.2d 163].)

Having reviewed the record in its entirety, we conclude that the jury found that defendant actually killed, *and* intended to kill, Linda Faye Rodgers within the meaning of *Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1146, 102 S.Ct. 3368]. We also conclude that these findings are amply supported and adopt them as our own. Accordingly, we hold that imposition of the penalty of death on defendant does not violate the Eighth Amendment to the United States Constitution. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716, 106 S.Ct. 689].)

It is so ordered.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied June 24, 1992.