Filed 5/25/16  P. v. Zazueta CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B262712 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. VA131976) |
| SEBASTIAN ZAZUETA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Affirmed.

Laura S. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb and Nathan Guttman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Sebastian Zazueta of one count of murder (Pen. Code,[1] § 187, subd. (a)), and four counts of attempted murder (§§ 664/187, subd. (a)), with firearm allegations found true as to each count (§ 12022.53, subds. (b)–(d).) The trial court sentenced him to state prison for 50 years to life, 25 years to life for count 1, plus an additional 25 years to life for the firearm allegation; consecutive terms for counts 2 and 3, and concurrent terms of life plus 25 years to life for counts 4 and 5. On appeal, he contends that the trial court erred in using CALJIC No. 8.66.1 because it misstates the law on the "kill zone" theory for attempted murder. He also contends that the prosecutor committed misconduct, or in the alternative that he received ineffective assistance of counsel based on counsel's failure to object to the misconduct. We reject appellant's contentions, and affirm.

**FACTUAL BACKGROUND**

On September 21, 2013, appellant attended a concert at the El Rodeo Nightclub in Pico Rivera with his brother Jesus Andres Zazueta ("Andres"), Andres's wife Nubia Casarez, Magdalena Zaldivar and Zaldivar's husband Jesus Hinojosa, who was celebrating his birthday. The group rode to the concert in Hinojosa's SUV, which was left with one of the four valets[2] working the club that

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     The four valets working at the El Rodeo Nightclub that evening were: Ramiro Barajas, Juan Ruiz, Oscar Cortez ("Oscar") and his brother, Melvin Cortez ("Melvin"). Because two valets share a surname, we refer to them by their first names, not out of disrespect but for the sake of clarity and convenience. (See *Cruz v. Superior Court* (2004) 120 Cal.App.4th 175, 188, fn. 13.) None of the valets was armed.

night. They separated after paying their entrance fees. Appellant was not drinking before the group got to the club. Zaldivar testified that, except for stopping by their table for an occasional drink, appellant spent no time inside the club with her and Hinojosa; when she did see appellant, his behavior was not unusual in any way.

After an argument at about 11:30 p.m., Andres and Casarez left the club, and appellant went out to look for them. All three returned about five minutes later. Security guards let Casarez back inside but told Andres and appellant they had to pay again in order to re-enter. Appellant and Andres argued with the guards. Appellant was "a little bit" bothered about being required to pay twice. The brothers tried to force their way back in, but were physically removed by security. Eventually, Andres and appellant re-paid the entrance fee and returned to the club to watch the rest of the concert. Casarez saw appellant drink during this period, but did not know how much he had to drink.

Zaldivar and Hinojosa left at about 1:50 a.m., when the concert ended. They retrieved the SUV, which Hinojosa drove toward the club entrance to wait for the rest of the group. While they were waiting, Hinojosa and Zaldivar were told twice by Angel Guillen, the club's security guard responsible for clearing the exit and parking lot, to leave. Casarez and Andres emerged from the club and got to the SUV at about 2:20 a.m. Appellant came out about 10 minutes later; he was upset, angry and extremely drunk.

Guillen saw appellant, who seemed drunk, after he left the club. Guillen had not seen appellant before. At about 2:35 a.m., Guillen saw appellant urinating behind Hinojosa's SUV. The guard shined a flashlight on appellant and told him it was time "to go." Appellant called Guillen an "asshole," and said he was "taking a leak," then leaving. Guillen did not threaten appellant.

3

Just then, appellant grabbed something from inside the rear door of the SUV. Appellant said something unintelligible to Andres, before saying, "they are gonna pay for it." Oscar testified that appellant ran out "with a pistol," saying, "you think you're so much, you sons of bitches?," or "you think you're tough?" Oscar heard four or five shots. Guillen heard a valet scream "look out"! He glanced up to see that appellant had a gun in his hand, which he was aiming and firing at Guillen and the valets, less than 35 feet away. Appellant emptied the clip. Unable to escape, Guillen threw himself toward Melvin, who was on the ground. Guillen heard about nine shots. Melvin later died from a single gunshot wound to the chest. The other three valets were unhurt; Guillen survived after being shot in the arm, stomach and knee.

Zaldivar, who earlier had switched places with Hinojosa and was now in the driver's seat, began to drive away. She stopped when Andres, who was in the back seat, tried to open the door and get out because he was afraid his brother had been hurt. Appellant climbed into the back seat of the SUV and told Zaldivar to drive. She refused. Afraid that appellant might shoot her, Zaldivar threw the keys to her husband and they, Cazares and Andres ran back into the club. Before going back into the building to wait for the police, Zaldivar looked back and saw appellant in the driver's seat of her the SUV.

A Los Angeles County Sheriff's deputy responding to the call about the shooting at the nightclub saw appellant running in the parking lot by the building and yelled for him to stop. Appellant kept running. The deputy chased after and detained appellant, who stopped running on a nearby street.

Another deputy responding to the shooting call pulled into the lot behind Hinojosa's vehicle and retrieved the semiautomatic handgun appellant used from the ground underneath Hinojosa's SUV and placed it in her patrol car. The

4

magazine was later recovered from a search of the inside of the SUV, on the front driver's side.

A sergeant found nine shell casings, three bullets and a jacket from a fourth bullet in the parking lot where the shooting occurred. He found three bullet strike marks on the club building near where the valets stored car owners' keys, and a fourth strike mark 15-to-20 feet up on the same wall. One bullet was later recovered from Melvin's chest. A criminalist tested the gun, shell casings, fired bullets and bullet jacket recovered from the shooting scene, and the bullet from Melvin's chest. All were fired from the weapon recovered from the parking lot behind Hinojosa's SUV, a .45-caliber semiautomatic pistol. The criminalist explained that each shot required a separate pull of the sensitive trigger and, because of the force of recoil, a shooter would have to re-aim before each shot.

Appellant did not present any evidence.

## DISCUSSION

1. *The Court Did Not Err in Giving the "Kill Zone" Instruction, CALJIC No. 8.66.1*

a. *Forfeiture*

Appellant argues the court erred when it instructed the jury using CALJIC No. 8.66.1, because it misstates the "kill zone" theory of liability for attempted murder. We disagree.

Appellant's trial counsel objected that the kill zone instruction, CALJIC No. 8.66.1, should not be given because it was inapplicable to the facts of this case. But he did not object to any specific language in the instruction, nor did he ask that it be modified or clarified in any respect. The Attorney General contends that, by failing to challenge CALJIC No. 8.66.1 on these bases at trial, appellant forfeited

5

his challenge to the instruction on appeal. "'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.] But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012.) Because appellant contends not just that CALJIC No. 8.66.1 is misleading with regard to the kill zone theory of attempted murder, but that it misstates the law, his failure to object does not constitute forfeiture of the issue on appeal. (*Ibid*.) We turn to the merits of his contention.

      b.    *Standard of Review*

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) The challenged instruction is reviewed in the context of the instructions as a whole and in light of the entire record. (*People v. Lucas* (2014) 60 Cal.4th 153, 282, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) To the extent appellant asserts the jury was confused or mislead by the kill zone instruction it is up to him to demonstrate that jurors understood the instruction in the way he claims. (See *People v. Cross* (2008) 45 Cal.4th 58, 67–68 [defendant who challenges instruction as being subject to jurors' erroneous interpretation, must demonstrate a reasonable likelihood that jury understood the instruction in the way he asserts].) "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions." (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

c.       *Attempted Murder Law*

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Stone* (2009) 46 Cal.4th 131, 136 (*Stone*).)  In *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), the court concluded that the doctrine of transferred intent does not apply to attempted murder.  (*Id*. at p. 317.)  "To be guilty of attempted murder, the . . . defendant's mental state must be examined as to each alleged attempted murder victim." (*Id*. at p. 328; see *People v. Perez* (2010) 50 Cal.4th 222, 230 (*Perez*).) This "is true whether the alleged victim was particularly targeted or randomly chosen." (*Stone, supra*, 46 Cal.4th at p. 141.)  Although attempted murder requires the specific intent to kill, the defendant need only intend "'to kill *a* human being, not a *particular* human being.'" (*Perez, supra*, 50 Cal.4th at p. 230.)  Thus, in *Stone*, the court held that one who shoots at a group of people intending to kill someone among the group, but not knowing or caring who, may be convicted of attempted murder because an "indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Stone, supra*, 46 Cal.4th at p. 140.)  Under this reasoning, a jury could convict a defendant "of several attempted murders if he intended to kill several people, even if there were no particular people he intended to kill." (*People v. McCloud* (2012) 211 Cal.App.4th 788, 799, rev. denied March 13, 2013 (*McCloud*).)

7

d.  *CALJIC No. 8.66.1, "Kill Zone" Instruction as Erroneous or Misleading*

The jury here was instructed with the standard version of the CALJIC No. 8.66.1 "kill zone" instruction in place at the time of trial:[3]

> "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone' is an issue to be decided by you."

The jury also was instructed not to "single out any . . . individual point or instruction and ignore the others," and to "[c]onsider the instructions as a whole and each in light of all the others." The jury was further instructed that: (1) it was the prosecution's duty to prove each element of the charged offenses beyond a

---

[3]  CALJIC No. 8.66.1, revised in fall 2015, now states:
"A person who primarily intends to kill one person, or persons, known as the primary target[s], may at the same time attempt to kill [all] [people] [persons] in the immediate vicinity of the primary target[s]. This area is known as the 'kill zone.' A kill zone is created when a perpetrator specifically intending to kill the primary target by lethal means also attempts to kill [anyone] [everyone] in the immediate vicinity of the primary target[s]. If the perpetrator has this specific intent, and employs the means sufficient to kill the primary target[s] and all others in the kill zone, the perpetrator is guilty of the crime[s] of attempted murder of the [other person[s]] [anyone] in the kill zone.
"Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a ['kill zone'] [zone of risk] is an issue to be decided by you."
The comment following the instruction notes the "fall 2015 revision [was] meant to more accurately track the holding in . . . *Bland*."

8

reasonable doubt; (2) each of the five counts charged—including attempted murder—required proof of a specific intent; (3) murder requires implied or express malice; (4) express malice means an intent to kill; (5) attempted murder requires express malice; and (6) willful, deliberate and premeditated murder (whether attempted or completed) requires an intent to kill.

e.     *Analysis*

Appellant argues that the version CALJIC No. 8.66.1 used at trial is erroneous because it fails to define "kill zone," fails to mention the prerequisite of specific intent, and misleadingly mandates a finding of concurrent intent if a juror could reasonably infer that the defendant intended to kill everyone in the area, irrespective of whether a juror actually draws that reasonable inference.

Appellant's arguments regarding the inadequacies of CALJIC No. 8.66.1 rest primarily on criticisms raised in dicta in *McCloud, supra*, 211 Cal.App.4th 788, a decision by Division One of this District.[4] In *McCloud*, two defendants fired 10 shots from a semiautomatic handgun into a packed party inside a building containing over 400 people. Three bullets hit three victims; two were killed and one was injured. Seven bullets hit no one. (*Id*. at pp. 791, 793–794.) The jury was instructed with CALJIC No. 8.66.1, and the prosecution argued in its closing statement that "'[t]he kill zone says that anyone who is in the line of fire, anyone

---

[4]     Although the Supreme Court denied review in *McCloud*, the scope of the kill zone theory as interpreted by the appellate courts is currently under review. In July 2015, the Supreme Court granted review in *People v. Sek*, S226721, an opinion by Division One on a related issue. The Court deferred further action on *Sek* pending its disposition of *People v. Canizales*, review granted November 19, 2014, S221958, a case that criticized *McCloud*.

who could have potentially been hit is a victim of that attempted murder. . . . You take a gun, you sho[o]t at a party, you are not sure who at that party is going to get hit, you can still get the kill zone. You are still endangering every single person in that line of fire.' . . . 'All of those kids are all in the zone of risk. All of them are potential and actual victims in this case.'" (*Id*. at p. 801.) Both defendants were convicted of two counts of second degree murder. One defendant, Stringer, was also convicted of 46 counts of attempted murder. (*Id*. at p. 791.)

The court concluded that the prosecutor's argument was based on an erroneous conception of the kill zone theory, because the prosecutor had not argued there was a primary target, and simply "assumed that individuals who are merely endangered or put 'at risk' or located within 'the zone of risk' are attempted murder victims on the kill zone theory. That is incorrect as a matter of law. The prosecutor never attempted to argue that Stringer . . . specifically intended to kill every single person in each of the putative kill zones, as the kill zone theory would actually require." (*McCloud, supra*, 211 Cal.App.4th at p. 802.) Thus, the court found the record lacked sufficient evidence to support application of the kill zone theory, and reversed the attempted murder counts. (*Id*. at pp. 802, 804.)

Having stated its holding, the court noted in dicta that "that the language of CALJIC No. 8.66.1 . . . concerning the kill zone theory," the same language at issue here, "directly lends itself to the prosecutor's incorrect statement of the theory," because the instructions "repeated references to a 'zone of risk' are misleading and have no basis in the law—neither the phrase 'zone of risk' nor even the word 'risk' appears anywhere in *Bland*. . . . By referring repeatedly to a 'zone of risk,' the instruction suggests to the jury that a defendant can create a kill zone merely by subjecting individuals other than the primary target to a risk of fatal

10

injury. As we have already explained, that is not correct." (*McCloud, s*upra, 211 Cal.App.4th at p. 802, fn. 7.)

In our view, *McCloud* misunderstands the kill zone theory and instruction. *Bland* held that intent to kill a person may be inferred either from the nature and scope of an attack or the method employed. (*Bland, supra*, 28 Cal.4th at pp. 330, 331, fn. 6.) But, under *McCloud*, such an inference would appear to be impermissible. The view that *McCloud* goes too far finds support in *Stone, supra,* 46 Cal.4th 131. In *Stone*, referring to *Bland's* kill zone theory, the Court found that the "evidence supported a jury finding that the defendant intended to kill the driver [of the car into which he shot] but did not specifically target the two who survived. [Citation.] . . . . We summarized the rule that applies when an intended target is killed and *unintended* targets are injured but not killed. . . . [¶] . . . . [I]f a person targets one particular person, . . . a jury could find the person *also*, concurrently, intended to kill—and thus was guilty of the attempted murder of— other, *nontargeted* persons." (*Id*. at p. 136 (some italics added); see also *People v. Smith* (2005) 37 Cal.4th 733, 755–756 (dis. opn. of Werdegar, J.) ["kill zone . . . analysis . . . focuses on (1) whether [jury] can rationally *infer from the type and extent of force employed* in the defendant's attack on the primary target *that the defendant intentionally created a zone of fatal harm*, and (2) whether the nontargeted . . . attempted murder victim inhabited that zone of harm" (italics added)].)

Further, the phrase "zone of risk" employed in CALJIC No. 8.66.1 cannot be viewed in isolation. It must be construed in light of the entire instruction of which it is a part. (*People v. Ledesma* (2006) 39 Cal.4th 641, 718.) Viewed as a whole, the instruction adequately imparted the requirement that the jury find that appellant harbored a specific intent to kill. A reasonable jury would not have construed

11

CALJIC No. 8.66.1 to mean that it could find he committed attempted murder merely because he placed Guillen and the valets at risk of harm.

In addition, the court properly instructed on the elements of attempted murder with CALJIC No. 8.66, with which appellant does not take issue and which includes the specific intent requirement, and directed the jury to consider the instructions as a whole and in light of the others. We presume that jurors understood and followed the court's instructions. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005.) A reasonable jury, considering the instructions as a whole and in conjunction with CALJIC No. 8.66.1, would not conclude it could find appellant guilty of attempted murder based solely on the conclusion that he exposed the members of the group to a risk of harm. (Cf. *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1395–1396 [jury was not misled by use of phrase "zone of harm" in analogous "kill zone" instruction CALCRIM No. 600, providing that "'[a] person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or "kill zone"'"]; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1243 [finding no possibility that jury misapplied CALCRIM No. 600 and failed to find defendant had specific intent to kill victim, partly due to fact that jury was instructed on elements of attempted murder, including requirement of specific intent].)

In sum, we reject appellant's contention that CALJIC No. 8.66.1 misstates the law as to the kill zone theory or misled the jury and permitted it to find him guilty of attempted murder without finding that he had the specific intent to murder the victims who survived the shooting.

f.      *Harmless Error*

Even if we assume the instruction was erroneous, any error would be harmless because it was not reasonably probable that, had a correct instruction been given, a more favorable verdict would have resulted.[5] By finding appellant committed five willful, deliberate and premeditated (attempted and completed) murders, the jury necessarily found that each crime was committed by appellant with a "clear, deliberate intent to kill." Thus, even assuming appellant is correct (he is not) that the prior version of CALJIC No. 8.66.1 used at trial here misstated the law by failing to mention the requirement for specific intent, any error was harmless beyond a reasonable doubt because the jury independently found specific intent as to each count. (See *Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 836.)

2.      *The Claim of Prosecutorial Misconduct was Forfeited*

a.      *Relevant Proceedings*

In closing, the prosecutor argued:

"*And willful, deliberate, premeditated means that you thought about the process. Intent to kill comes before the fact. That's all it means.* Premeditated means you thought about killing, and then you kill.

---

[5]     The parties agree the federal constitutional standard governs the harmless error analysis. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) We find the purported instructional error harmless under any standard. (See, e.g., *Neder v. United States* (1999) 527 U.S. 1, 15–16 [use of an instruction that omits element of an offense does not require reversal if error is harmless beyond a reasonable doubt under *Chapman, supra,* 386 U.S. at p. 24; *People v. Flood* (1998) 18 Cal.4th 470, 487, 490 [misdirection of the jury, including the giving of an incorrect or ambiguous instruction that does not amount to federal constitutional error, is reviewed under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)].)

". . . [A] clear example of first-degree murder is when you lie and wait for . . . somebody. You kill them. A lot of time goes by, you have time to prepare; right? However killing, coldhearted, coldblooded killing instant [*sic*] can also be willful, deliberate, premeditated. *The law does not say he hasn't had enough time to think about it before he kills, therefore, he's not first-degree murder. No.* It's the thought process and the act and intention that matters, not the duration of time.

"Example of willful, deliberate, premeditation: Some of you follow baseball; right? The pitcher standing at the mound. There's home plate. The distance between the pitcher mound and home plate is 60 feet, 6 inches. Batter's up, getting ready to bat. *When he's ready to bat, the ball can be coming 100 miles per hour. That decision he has to make, split decision whether to swing at it as it's coming over, or if it's gonna be a ball, he's gonna back off and not do it. When the ball's released from the pitcher coming hundred miles per hour, that decision he makes to swing involves willful, deliberate, premeditation.*

"Something closer to home: You guys are driving a car, you come to an intersection that's busy, you need to cross that intersection. Cars coming from your left, cars coming from your right. You got to decide. I see that truck coming about 50 feet. Am I gonna make it? *That decision, you deciding to move, you went through the intersection. That involves willful, deliberate, premeditation. So that's how quick it can be.*" (Italics added.)

Appellant asserts that, by using flawed, misleading analogies, the prosecutor's argument misstated the law regarding and improperly equated premeditation and deliberation with malice aforethought.

b.      *Forfeiture*

The Attorney General contends appellant's claim of prosecutorial misconduct is forfeited. We agree. Appellant's trial counsel raised no objection to, nor sought any judicial admonition regarding, the prosecutor's closing

14

argument. On appeal, appellant does not argue that such an objection would have been futile. As a result, appellant's claim of prosecutorial misconduct was not preserved for review. (*People v. Benson* (1990) 52 Cal.3d 754, 794; *People v. Clair* (1992) 2 Cal.4th 629, 662 (*Clair*).)

3.      *No Demonstration that Trial Counsel was Ineffective*

Appellant attempts to avoid forfeiture by arguing that his trial counsel was ineffective in failing to object to the prosecutor's statements. We disagree. A decision to raise or forgo an objection at trial is typically a tactical decision and we are reluctant to "second-guess trial counsel" except in rare instances. (*People v. Frierson* (1979) 25 Cal.3d 142, 158.)

Prior to closing arguments, the jury was told to base its decisions solely on the evidence and the jury instructions. The court specifically informed the jury that if "anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with [the court's] instructions on the law, [the jury] must follow [the court's] instructions." (CALJIC No. 1.00.) The jury is presumed to have understood and followed the court's instructions. (*People v. Hovarter, supra,* 44 Cal.4th at p. 1005.) In addition, before he began his argument, the prosecutor told jurors it was his "opportunity [to] tell [the jury] what [he] believe[s] the evidence has shown," but also reminded them that his summation of controlling law was "not . . . evidence."

During summation, a prosecutor may refer to matters which, while not in evidence, are common knowledge or illustrations drawn from common experience, history, or literature to help illustrate legal principles. (*People v. Friend* (2009) 47 Cal.4th 1, 38.) Where, as here, "the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood

15

that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) We evaluate those comments in the context of the entire argument and the jury instructions. (*People v. Stitely* (2005) 35 Cal.4th 514, 558-559 (*Stitely*).) In doing so, we presume jurors followed the "court's instructions as a statement of the law," and viewed the prosecutor's comments as those of an advocate made "in an attempt to persuade." (*Clair, supra,* 2 Cal.4th at p. 663, fn. 8.)

Appellant points to nothing in the record that overcomes the presumption that the jury abided by the court's instructions and did anything other than treat the parties' closing arguments as the advocacy they were, followed the court's direction and based its decisions on the evidence, and understood that the court's instructions prevailed over any conflicting statement of law made by counsel. (*Clair, supra*, 2 Cal.4th at p. 663, fn. 8.) Appellant has made no showing that the jury was or may have been misled in the manner he suggests, because there is no evidence to rebut the presumption that it failed to "abide[] by the court's admonitions and instructions." (*Stitely, supra,* 35 Cal.4th at p. 559.)

Finally, contrary to appellant's claims, there was a sound tactical reason for defense counsel's failure to object: an objection would have been unnecessary, disruptive and redundant in light of the court's admonitions to follow only its instructions as to the law, and its additional instructions that only its legal definitions, not counsel's, controlled. "[R]easonable counsel may well have determined that an objection would be unwise . . . because an objection (and possibly an admonition as well) likely would have served to highlight matter that might be unfavorable to defendant." (*People v. Stew*art (2004) 33 Cal.4th 425, 509.) Finally, as discussed above, any failure to object was not prejudicial given the overwhelming evidence of appellant's guilt which established, beyond a

reasonable doubt, that appellant committed willful, deliberate and premeditated acts of murder and attempted murder.  In sum, we are confident that any reasonable jury would have reached the same result even in the absence of the prosecutor's remarks.


**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



WILLHITE, J.



We concur:



EPSTEIN, P. J.



COLLINS, J.


17